**In re CHARTER COMMUNICATIONS, INC., Debtors.**

**R $^2$ Investments, LDC, Appellant,**

**v.**

**Charter Communications, Inc., et al., Appellees.**

**Law Debenture Trust Co., Appellant,**

**v.**

**Charter Communications, Inc., et al., Appellees.**

**Nos. 09 CV 10506 (GBD), 09 CV 10566 (GBD).**

United States District Court, S.D. New York.

March 30, 2011.

**16**

Andrew W. Hammond, White & Case, New York, NY, for Law Debenture Trust Company of New York.

Paul Basta, Weil, Gotshal & Manges LLP (NYC), New York, NY, for Charter Communications, Inc. in Nos. 09CV10506(GBD), 09CV10566(GBD).

Alan W. Kornberg, Paul, Weiss, Rifkind, Wharton & Garrison LLP (NY), New York, NY, for CCH I, LLC, CCH I Capital Corporation, CCH II, LLC, CCH II Capital Corporation in Nos. 09CV10506(GBD), 09CV10566(GBD).

David S. Elkind, Ropes & Gray LLP (NYC), New York, NY, for Official Committee of Unsecured Creditors in Nos. 09CV10506(GBD), 09CV10566(GBD).

Jay Michael Goffman, Robert E. Zimet, Jeremy A. Berman, Skadden, Arps, Slate, Meagher & Flom LLP (NYC), New York, NY, for Paul G. Allen in Nos. 09CV10506(GBD), 09CV10566(GBD).

Frederick N. Stevens, Fox Rothschild, Attorneys at Law (NYC), New York, NY, Lawrence Saul Robbins, Eric Jay Feigin, Mark Stancil, Matthew M. Madden, Robbins Russell Englert Orseck Untereiner &

Sauber, LLP, Washington, DC, for R[2] Investments, LDC.

## MEMORANDUM DECISION AND ORDER

GEORGE B. DANIELS, District Judge.

Appellants R[2] Investments, LDC, ("R[2]") and Law Debenture Trust Co. ("LDT") appeal from the Confirmation Order of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") dated November 17, 2009, wherein the Bankruptcy Court issued extensive findings of fact and conclusions of law, and confirmed the pre-negotiated Chapter 11 Plan of Reorganization (hereinafter, the "Plan") by Charter Communications, Inc. ("CCI" and, together with its 130 affiliated debtors, "Charter" or the "Debtors").[1] See LDT Designated Record (LDT–DR), Item 4. R[2] also appeals from the Opinion on Confirmation of Plan of Reorganization and Adjudication of Related Adversary Proceeding issued the same day. See JPMorgan Chase, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns), 419 B.R. 221 (S.D.N.Y.2009), also available at LDT–DR, Item 165. Appellants assert that the Bankruptcy Court erred as a matter of fact and/or law on several issues, and, as a consequence, LDT requests an order vacating, in part, the Confirmation Order. R[2] also requests an order vacating the entire Confirmation Order and remanding this matter to the Bankruptcy Court with

---

1. CCI is a publicly traded holding company whose principal asset is its 55% equity interest in Charter Communications Holding Company LLC ("Holdco"), the direct parent of CCHC, LLC ("CCHC"), and whose only business is to act as the managing member of Holdco and its subsidiaries. See LDT–DR, Item 12, Debtor's Disclosure Statement, at 14. Charter Communications Holdings, LLC ("CCH"), one of the Holdco subsidiaries, operates the broadband business. Id. Another group of subsidiaries were formed and exist solely as co-issuers of debt issued with their parent companies. Id. at 14–15. Allen owns 100% equity interest in Charter Investment, Inc. ("CII"), which owns 45% equity interest in Holdco. Id. at 15. Allen also controls CCI through a voting control interest of 91%. Id. For a graphical depiction of the pre-petition organizational and capital structure, see id. at 16.

instructions for specific relief or, in the alternative, further proceedings. Appellees Charter, Paul Allen, and the Official Committee of Unsecured Creditors separately move to dismiss the appeals as equitably moot.

## BACKGROUND

### A. THE PARTIES

In 2009, Charter was the fourth largest cable television company in the United States. *In re Charter Commc'ns*, 419 B.R. at 230. On March 27, 2009, Charter filed voluntary petitions for bankruptcy protections under Chapter 11 of the Bankruptcy Code *and* a pre-negotiated reorganization plan, commencing what the Bankruptcy Court described as "perhaps the largest and most complex prearranged bankruptcies ever attempted, and in all likelihood ... among the most ambitious and contentious as well." *Id.* Charter had "a large operationally sound business saddled with almost twenty-two billion dollars in debt at various levels of a capital structure stacked with multiple intermediate limited liability holding companies." *Id.* at 231. "[D]ue to the dislocation of the credit markets, lower valuation multiples applicable to peer companies in the cable sector and its own excessive leverage," "Charter needed to restructure promptly to avoid a potentially catastrophic free-fall bankruptcy." *Id.* at 232.

Charter was effectively a Paul Allen company at that time. *See id.* at 231. Allen was Chairman of CCI's Board of Directors. *See id.* at 240. Allen was a controlling shareholder. *See id.; see also, supra,* note 1. Allen had invested billions of dollars in Charter over the years. *See In re Charter Commc'ns*, 419 B.R. at 230; *see also* LDT–DR, Item 38, 9/2/2009 Hearing, at 121–125 (describing Allen's assistance organizing and financing Charter). Allen's maintenance of at least 35% voting interest in the operating company, COO, was an express condition in Charter's senior secured credit agreement to avoid a change of control default. *See In re Charter Commc'ns*, 419 B.R. at 238–240. Allen, pursuant to the Exchange Agreement, had the right to exchange his Holdco units for CCI common stock on a tax-free basis, though doing so would trigger negative tax consequences to Charter—namely, "a material limitation on the use of a substantial amount of [Charter's] existing net operating loss carried forward." LDT–DR, Item 38, at 130–132; *see also* LDT–DR. Item 49. 11/12/1999 Exchange Agreement.

Appellant Law Debenture Trust Company ("LDT") served as the indenture trustee for the holders (the "CCI Noteholders") of $479 million in aggregate principal of convertible notes issued by CCI, the "most structurally subordinated creditor" in Charter's capital structure, and furthest removed from the operational assets. 6/25/2010 Charter Br., Tab 31, Transcript of Confirmation Hearing–Closing Arguments (Oct. 1, 2009), at 41–43; *In re Charter Commc'ns*, 419 B.R. at 231. Appellant R $^2$ Investments, LDC ("R $^2$") owned convertible notes represented by LDT, and, became a substantial shareholder of CCI during the bankruptcy proceedings. *See* 6/25/2010 Charter Br., Tab 4, 5/28/2009 Declaration of Status by R $^2$ Investments.

### B. THE PLAN

Lazard Freres & Co. LLC, the "chief architect" of the Plan, determined that it was in Charter's best interest to "engage in a high velocity negotiation with bondholders while leaving the senior debt in place to take full advantage of favorable pricing applicable to the existing senior

indebtedness." [2] *In re Charter Commc'ns,* 419 B.R. at 231, 233–34. To do so, Lazard "recognized the vital importance" of avoiding a change of control default, which would have precluded reinstatement of senior debt. *Id.* at 231, 233. Lazard also sought to "trim debt and raise new equity by having holders of fulcrum debt securities convert their bonds to equity interests and agree to invest in the reorganized capital structure." *Id.* at 233.

After aggressive, arms length, good-faith pre-petition negotiations between Charter, Allen, and the Crossover Committee,[3] all of whom were represented by separate and sophisticated legal and financial advisors, an agreement (i.e. the CII Settlement), "that ... bec[a]me the foundation of Charter's pre-negotiated Plan," was reached.[4] *See id.* at 233, 256–57, 260–61; Confirmation Order ¶¶ 36–37. The Plan "removed more than $8 billion from Charter's highly leveraged capital structure; secured the investment of approximately $1.6 billion in new capital by means of a rights offering during an exceptionally difficult and uncertain time in the credit markets; reinstated a $12 billion senior credit facility and certain junior secured debt that preserved favorable existing credit terms and saved hundreds of millions of dollars in annual interest expense that would have been payable if the senior

credit facility had to be replaced at current market pricing; and preserved billions of dollars of [Net Operating Losses or] NOLs." 6/25/2010 Charter Br., at 7; *In re Charter Commc'ns,* 419 B.R. at 230, 259. The Plan also "effectively wipes out [ ]Allen's eight billion dollar investment in Charter and strips him of any meaningful ongoing economic interest in the company," such that New or Restructured Charter "will cease to be a Paul Allen company" and "new investors [may now] influence the management." *Id.* at 230–31.

The important aspects of the Plan relevant to the pending appeals are as follows. First, in Article VI.C, the Plan provides for the CII Settlement.[5] Allen agreed to: "(i) prospectively obligate himself to maintain a 35% voting (but not equity) interest in Charter; (iii) designate four of the eleven directors on Charter's Board; (iii) refrain from exercising his pre-petition exchange rights; (iv) retain a 1% interest in Holdco upon consummation of the Plan; (v) relinquish various claims against, and interests in, Charter held independently of his status as a Charter stockholder; and (vi) enter into a new exchange agreement with Charter under which, if he exercised his rights to exchange Holdco units for Charter stock in a taxable transaction, he would provide Charter with a step up in

**2.** There were uncertainties present within the credit markets following the collapse of Lehman Brothers regarding the potential inability to obtain such a large amount of alternative financing, or, even if replacement credit facilities could have been obtained, the ability to acquire terms as favorable as those present within their pre-existing senior debt. *See In re Charter Commc'ns,* 419 B.R. at 231, 233, 233 n. 5.

**3.** The Crossover Committee was "[a]n ad hoc committee [of bondholders] ... consisting of unaffiliated holders of 11% senior secured notes due 2015 issued by CCHI, LLC and CCH I Capital Corporation and the 10.25%

Senior Notes due 2010 of CCH II, LLC and CCH II Capital Corporation." *Id.* at 233, 233 n. 7.

**4.** The Plan is attached to the Confirmation Order as Exhibit A.

**5.** The CII Settlement was the product of intensive arms length, good faith negotiations between Allen, CCI's Board of Directors and Management (absent Allen and his affiliated directors, or their undue influence), and the Crossover Committee, an ad hoc committee of bondholders. Confirmation Order ¶¶ 36–37; *In re Charter Commc'ns,* 419 B.R. at 231, 233.

the tax basis of its assets." 6/25/2010 Paul Allen Br., at 4; Confirmation Order ¶¶ 31, 32, 43; *In re Charter Commc'ns,* 419 B.R. at 253–54. Allen's cooperation and participation created in excess of $3 billion in value for Charter, including 1.14 billion cash tax savings associated with preservation of $2.8 billion of NOLs, hundreds of millions of dollars for preservation of reinstatement ability, a step up in tax basis, and $1.6 billion infusion of new capital through the rights offering. *See In re Charter Commc'ns,* 419 B.R. at 240–41, 241 n. 15, 253; Confirmation Order ¶ 33. Debtors (except CCI) paid Allen $180 million in settlement consideration.[6] *See In re Charter Commc'ns,* 419 B.R. at 253; Confirmation Order ¶ 136.

Second, the Plan provides for Third Party Releases in conjunction with the CII Settlement. *See In re Charter Commc'ns,* 419 B.R. at 257; Confirmation Order ¶¶ 43, 44–45. Article X.E reads: "[T]he Holders of Claims and Interests shall be deemed to provide a full discharge and release to the Debtor Releases and their respective property from any and all Causes of Action, whether known or unknown, whether for tort, contract, violations of federal or state securities laws or otherwise, arising from or related in any way to the Debtors, including those in any way related to the Chapter 11 Cases or the Plan." Exceptions are made for "any Causes of Action expressly set forth in and preserved by the Plan," the impairment of certain rights, and actions by governmental authorities. *Id.*

Third, the Plan provided for the following payments to Appellants. The CCI Noteholders, including R[2] and others represented by LDT, received approximately 32.7% of their claims, but would have only be entitled to 18.4% in the event of liquidation under Chapter 7. *See In re Charter Commc'ns,* 419 B.R. at 261; Plan Art. IV, A–4. CCI shareholders who were not parties to the CII Settlement, including R[2], lost their equity interest in CCI and received no distribution under the Plan. *See In re Charter Commc'ns,* 419 B.R. at 231 ("all CCI shareholders will lose everything as their equity is cancelled"); Plan Art. IV, A–6. However, there were several classes of claims that were deemed impaired by the Plan,[7] and all of the holders of section 510(b) claims had their interests cancelled without receiving a distribution under the Plan.[8] *See* Plan Arts. IV–V.

## C. CONFIRMATION

CCI's Board of Directors unanimously approved both the Plan and the CII Settlement.[9] *In re Charter Commc'ns,* 419 B.R.

---

**6.** Debtors (except CCI) also paid Allen $175 million in claim and sale consideration, and $20 million in fee reimbursement, making his total compensation under the settlement $375 million. *See In re Charter Commc'ns,* 419 B.R. at 253; Confirmation Order ¶ 136.

**7.** *See* Plan Art. V (18 classes impaired with right to vote, 14 classes impaired and deemed conclusively to have rejected the Plan, and 26 classes unimpaired and deemed conclusively to have accepted the Plan).

**8.** Section 510(b) of the Bankruptcy Code provides for the treatment of claims for rescission of, or damages that arise from, a purchase or sale of securities of a debtor or a debtor's affiliate namely, the subordination "to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock."

**9.** "The CII Settlement was reviewed and approved by independent directors of Charter's board of directors who, while not members of a formal special committee, functioned as an independent group within the board. The independent directors ... [were] highly qualified individuals who had a regular practice during board meetings of convening separately from [ ]Allen and his designated directors

at 241. The Plan, including the CII Settlement, was ratified by seventeen of the eighteen classes eligible to vote,[10] with the lone objector being the CCI Noteholders. *See* Confirmation Order ¶¶ 12–13; Plan Art. III.A–4. Both Appellants subsequently filed objections to the Plan's confirmation with the Bankruptcy Court.[11] *See* LDT–DR, Item 5, LDT Objection to Confirmation; *id.*, Item 7, LDT Post–Trial Brief; *id.*, Item 8, R² Objection to Confirmation; *id.*, Item 9, R² Post–Trial Brief.

After hearing "extensive testimony and argument for nineteen days during the period from July 20 through October 1, 2009," the Bankruptcy Court determined that the Plan satisfies all of the confirmation requirements of 11 U.S.C. 1129, overruled all objections to the confirmation,[12] and confirmed the Plan on November 17, 2009. *In re Charter Commc'ns*, 419 B.R. at 230, 237; LDT–DR, Item 43, 10/15/2009 Hearing Transcript. The Bankruptcy Court also adopted the non-severability provision proposed in the Plan, providing that:

> Each term and provision of the Plan, and the transactions related thereto as it is heretofore may have been altered

or interpreted by the Bankruptcy Court is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and the transactions related thereto and may not be deleted or modified without the consent of the Debtors, the Crossover Committee, and Mr. Allen; and (3) non-severable and mutually dependent. It is further acknowledged that the participants in the Rights Offering, among others, will be advancing substantial sums to the Reorganized Company or taking other action contemplated by the Plan and this Order, including the reinstatement of the Senior Debt, which monies or other action will enable the Reorganized Company to make the distributions and other payments contemplated by the Plan and to reorganize as contemplated by the Plan.

Confirmation Order ¶ 152; *see also* Plan, Art XV.K.

Appellants separately filed emergency motions with the Bankruptcy Court pursuant to Fed. R. Bankr.P. 8005 for a stay of the Confirmation Order pending appeal. *See* LDT–DR, Item 166, LDT's Motion; *id.*, Item 171, R²'s Motion. Both motions

---

to consider what was in Charter's best interest." *In re Charter Commc'ns*, 419 B.R. at 241; Confirmation Order ¶ 37.

**10.** Twenty-six classes were unimpaired and deemed to accept the Plan without voting. Fourteen classes, including R²'s equity interests, were deemed to reject the Plan without voting because they were to receive no value whatsoever. Confirmation Order ¶¶ 12–13.

**11.** R² even attempted to form an Equity Committee, but the Bankruptcy Court denied the motion because R² presented no evidence that Charter was "anything other than hopelessly involvement at the equity level" or that "the issues that might be vetted by a committee are not currently being adequately addressed by others." 6/25/2010 Charter Br., Tab 20, Trial Transcript (6/17/2009), at 53.

**12.** In part, the Bankruptcy Court determined that: (1) the CCI Noteholders, which were structurally subordinated in the right of payment, received in excess to what they were entitled to receive under the Bankruptcy Code and were not entitled to a share of the NOLs, *id.* at 242, 261; (2) the Plan did not "unfairly discriminate" against LDT and was fair and equitable thereby satisfying the "cram down" provision under 11 U.S.C. § 1129(b) (1), *id.* at 266; (3) the settlement with Allen was fair and in the best interests of the corporation when viewed with "heightened scrutiny and some skepticism," *id.* at 240, and did not constitute a recovery on account of Allen's prepetition stock interests, *id.* at 241 n. 15; and (4) the Plan's Debtors Releases were an integral part of a comprehensive Plan that provides substantial value to the estate, *id.* at 257.

were denied on November 23, 2009. *See* 6/25/2010 Charter Br., Tab 32, Hearing Transcript (Nov. 23, 2009), at 57–61. LDT also sought a stay pending appeal from the United States District Court for the Southern District of New York (Stein, J.), which was denied on November 25, 2009. *See id.*, Tab 34, Order Denying Stay; *id.*, Tab 33, Hearing Transcript (Nov. 25, 2009). The Confirmation Order became effective on November 30, 2009.

## D. PENDING APPEALS

Appellant R[2] contends that the Bankruptcy Court committed three legal errors in confirming Charter's Plan: (1) the Plan improperly extinguished the equity interests of Charter's public shareholders without establishing that the their investments had no value; (2) the Paul Allen settlement violated the "absolute priority rule" and the "entire fairness" standard and thus was invalid; and (3) the Plain unjustifiably released Allen, his affiliates, certain of debtor's bondholders, the debtor's directors and officers, and others from all potential lawsuits related to the debtors and the plan of reorganization. Appellant R[2] specifically requests as relief for its respective claims that this Court reverse the Confirmation Order and remand this matter to the Bankruptcy Court with instructions to: (1) conduct a proper standalone valuation of CCI and direct the payment of the excess value to CCI's shareholders; (2) void the payment of $200 million in cash and securities to Allen,[13] and either direct Allen to return the entire payment or direct the Bankruptcy Court to conduct further proceedings to determine what Allen would have been willing to accept had competing plans been presented; and (3) strike the third-party releases bestowed upon Allen and others.

Appellant LDT contends that the Bankruptcy Court erred in (1) holding that acceptance of the Plan by the CCI General Unsecured Claims Class satisfied the cramdown requirements of 11 U.S.C. § 1129(a)(10); (2) finding that the CCI General Unsecured Claims were legitimately impaired for purposes of satisfying section U29(a) (10); and (3) holding that allowing junior claims or interests to retain or receive the value of CCI's net operating losses satisfied the absolute priority rule. LDT specifically requests that this Court vacate in part the Confirmation Order, or in the alterative, direct New Charter to pay the CCI Noteholders all or a portion of $330 million plus interest.[14] LDT also contends that (4) the Bankruptcy Court erred in holding that the Allen Settlement is not subject to entire fairness review and thus the Plan could not satisfy 11 U.S.C. § 1129(a)(3). Appellant LDT specifically requests payment of the same amount of consideration that Allen received for his participation in the CII Settlement, or, in the alternative, invalidation of the payment of $200 million to Allen.

## *JURISDICTION & STANDARD OF REVIEW*

■ District courts have jurisdiction to hear appeals from final orders issued by Bankruptcy Courts pursuant to 28 U.S.C. § 158(a) (1) and Fed. R. Bankr.P. 8001(a). "On an appeal the district court or bank-

---

**13.** Although not specified by R[2], this Court understands this amount to reflect both the $180 million in settlement consideration and the $20 million in fee reimbursement.

**14.** This figure is the current deficiency of the aggregate amount of CCI Notes claims allowed ($497 million), after taking account of payments such as $24.5 million in cash, preferred stock redeemed for $143 million, and any monies that may be distributed in the future from the $27 million in "Litigation Settlement Fund Proceeds" held by New Charter.

ruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order, decree or remand with instructions for further proceedings." Fed. R. Bankr.P. 8013. The Bankruptcy Court's legal conclusions are subject to *de novo* review, factual findings are subject to a clearly erroneous standard, and decisions based on equitable relief are subject to an abuse of discretion review. *See Jackson v. Novak (In re Jackson)*, 593 F.3d 171, 176 (2d Cir.2010) (quoting *In re Momentum Manufacturing Corp.*, 25 F.3d 1132, 1136 (2d Cir.1994); *In re Ames Department Stores, Inc.*, 582 F.3d 422, 426 (2d Cir. 2009)); *Nevada Power Co. v. Calpine Corp. (In re Calpine Corp.)*, 365 B.R. 401, 407 (S.D.N.Y.2007); *In re Adelphia Communications Corp.*, 2006 WL 1559437, at *2, 2006 U.S. Dist. LEXIS 37112, at *6 (S.D.N.Y. June 6, 2006).

## EQUITABLE MOOTNESS

### A. LEGAL STANDARD

▆▆▆ "[A]n appeal should ... be dismissed as [equitably] moot when, even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable." *Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. Official Comm. of Unsecured Creditors of LTV Steel Co. (In re Chateaugay Corp.)*, 988 F.2d 322, 325 (2d Cir.1993) ("Chateaugay I"). In the bankruptcy context, "where the ability to achieve finality is essential to the fashioning of effective remedies," equitable mootness serves as "a prudential doctrine [for declining to exercise constitutionally permissible jurisdiction] that is invoked to avoid disturbing a reorganization plan once implemented." *Id.* at 325–26 (citations omitted); *see also Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 144 (2d Cir. 2005) (collecting cases). The doctrine "does not involve a court's inability to alter the outcome by fashioning relief, but rather, a court's unwillingness to do so." *Bernardez v. Pawlowski (In re Pawlowski)*, 428 B.R. 545, 550 (E.D.N.Y.2009) (quoting *In re Box Bros. Holding Co.*, 194 B.R. 32, 39 (Bankr.D.Del.1996)) (quoting *In re UNR Indus.*, 20 F.3d 766, 769 (7th Cir. 1994)).

▆▆▆ It is well-established that bankruptcy appeals are strongly presumed to be equitably moot where the reorganization plan has been "substantially consummated."[15] *See Aetna Cas. & Sur. Co. v. LTV Steel Co. (In re Chateaugay Corp.)*, 94 F.3d 772, 776 (2d Cir.1996) ("Chateaugay III") ("Reviewing courts presume that it will be inequitable or impractical to grant relief after substantial consummation of a plan of reorganization."); *Chateaugay I*, 988 F.2d at 326 ("As a practical matter, completed acts in accordance with an unstayed order of the bankruptcy court must not thereafter be routinely vulnerable to nullification if a plan of reorganization is to succeed."); *In re Texaco, Inc.*, 92 B.R. 38 (S.D.N.Y.1988) ("When a confirmed plan of reorganization is involved, ... it is not hard to imagine that hundreds or even thousands of good-faith transactions by innocent parties may be undertaken in reliance thereon before an *appeal is* decided on the merits. Under such circumstances, it would be manifestly unjust

---

15. The Bankruptcy Code defines "substantial consummation" as: "(A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan." 11 U.S.C. § 1101(2).

to reverse on appeal....").[16] Nevertheless, an appellant may overcome the presumption by establishing *all* five *"Chateaugay* factors" remedy-by-remedy for each specific claim: [17]

(a) the court can still order some effective relief; (b) such relief will not affect the re-emergence of the debtor as a revitalized corporate entity; (c) such relief will not unravel intricate transactions so as to knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the Bankruptcy Court; (d) the parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings; and (e) the appellant

pursued with diligence all available remedies to obtain a stay of execution of the objectionable order ... if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from.

*Chateaugay II,* 10 F.3d at 952–53 (alteration in original) (internal quotation marks and citations omitted); *see also Freeman,* 2010 WL 6563101, at 4, 2010 U.S. Dist. LEXIS 21054, at \*11–12.

## B. SUBSTANTIAL CONSUMMATION

It is clear that Charter's Plan is substantially consummated pursuant to 11 U.S.C. § 1101(2).[18] The Plan obtained that status soon after the Confirmation Order became effective on November 30, 2009,[19] and innumerable actions have been

**16.** For examples of recent cases within this district applying this presumption, see *In re Metromedia Fiber Network, Inc.,* 416 F.3d 136, 144 (2d Cir.2005); *Freeman v. Journal Register Co.,* 2010 WL 6563101, 2010 U.S. Dist. LEXIS 21054 (Bankr.S.D.N.Y. Mar. 5, 2010); *A & K Endowment, Inc. v. Gen. Growth Props., Inc. (In re General Growth Props., Inc.),* 423 B.R. 716 (S.D.N.Y. Feb.16, 2010); *Windels Marx Lane & Mittendorf, LLP v. Source Enters. (In re Source Enters.),* 392 B.R. 541, 549 (S.D.N.Y.2008); *Compania Internacional Financiera S.A. v. Calpine Corp. (In re Calpine Corp.),* 390 B.R. 508 (S.D.N.Y.2008); *Foster v. Granite Broad. Corp. (In re Granite Broad. Corp.),* 385 B.R. 41 (S.D.N.Y.2008).

**17.** "[E]quitable mootness applies to specific claims, not entire appeals." *Bank of New York Trust Co., NA v. Official Unsecured Creditors' Comm. (In re Pacific Lumber Co.),* 584 F.3d 229, 241 (5th Cir.Tex.2009) (citing *In re AOV Industries Inc.,* 792 F.2d 1140, 1148, 253 U.S.App. D.C. 186 (D.C.Cir.1986) ("In exercising its discretionary power to dismiss an appeal on mootness grounds, a court cannot avoid its obligation to scrutinize each individual claim, testing the feasibility of granting the relief against its potential impact on the reorganization scheme as a whole.")); *see also Deutsche Bank AG,* 416 F.3d at 144 ("equitable mootness bears only upon the proper remedy").

**18.** Neither Appellant challenges this conclusion. See 3/25/2010 LDT Br., at 4; 3/24/2010 R[2] Br., at 4–5. Notably, the Bankruptcy Court considered the Plan to be substantially consummated in December 2009. *See* Declaration of Paul M. Basta in Support of Charter's Motion to Dismiss, Ex. C, Hearing Transcript (Dec. 17, 2009), at 20–22 ("My understanding is that the plan has been substantially consummated.... How can you disagree with that proposition?.... [Disagreeing] would make you a vexatious litigant in my view.").

**19.** The various immediate actions that were taken by Charter in reliance on the Confirmation Order include cancelling all former common and preferred equity in Charter; issuing nearly 89 million shares of new Class A common stock through a rights offering that raised approximately $1.6 billion; converting CCH I Notes into approximately 21.1 million shares of new Class A common stock; exchanging old CCH II Notes for new CCH II Notes valued in an aggregate amount of approximately $1.77 billion; issuing approximately 5.5 million shares of preferred stock to CCI Noteholders (i.e. LTD) who later redeemed them in full for $143 million in cash from New Charter; issuing warrants to holders of CCH Notes and CIH Notes allowing them to purchase approximately 7.7 million shares of new Class A stock; and naming new

taken by Charter and other third-parties in furtherance of and in reliance on the Confirmation Order.[20] The pending appeals of the Bankruptcy Court's Confirmation Order are, therefore, presumed to be equitably moot. Appellants R[2] and LDT may rebut this presumption by establishing the *Chateaugay* factors with respect to each of their claims; otherwise, dismissal is appropriate regardless of the merits.

## C. CHATEAUGAY ANALYSIS

Appellants seek relief that appears to be less in magnitude than directly unraveling the current Plan and directing Charter to renegotiate or implement a whole new plan.[21] However, viewed in the broader context of the Confirmation Order, Plan, and subsequently consummated transactions, each requested remedy requires vacating and modifying cherry-picked provisions of the Plan without any consideration for their substantial impact on the provisions left intact. The Plan was a means to satisfy outstanding financial obligations so that Charter would return to profitability *and* to avoid triggering immediate obligations that would put Charter out-of-business. Appellants' arguments—namely, New Charter's ability to afford the remedy, the impact on a third party's conduct, and unsupported recitations of *Chateaugay*

factors—are wholly unpersuasive and fail to satisfy their burden to demonstrate that the proposed piecemeal dismantling would not jeopardize the bankruptcy's finality or otherwise be inequitable. The pending appeals thus represent the epitome of equitable mootness not only because the Plan has been substantially consummated, but because each requested remedy would be inequitable and would nullify the Plan's authorization by the various constituencies and the Bankruptcy Court, thereby causing the entire Plan to unravel and threatening New Charter's vitality.

### 1. Allen Settlement Claim (R[2] and LDT)

■ None of the requested relief—i.e. directing Allen to return some or all of his settlement consideration (R[2] and LDT) or directing New Charter to pay similar consideration to the CCI Noteholders (LDT)—is available. The Plan as adopted by the Confirmation Order expressly provided for the terms of the CII Settlement, making the CII Settlement an agreement within, rather than separate from, the Plan. Pursuant to the Confirmation Order, those terms are "nonseverable and mutually dependent," "integral" and "may not be deleted or modified without the consent of the Debtors, the Crossover Committee,

---

directors. *See* 6/25/2010 Charter Br., at 10 (citing Basta's Motion to Dismiss Declaration, Exs. A ("Declaration of Gregory Doody") and B ("Declaration of David Kurtz")).

**20.** Numerous additional transactions have since occurred involving the distribution of New Charter's equity interests, the collection and distribution of hundreds of millions of dollars, and the implementation of operational, governance, and regulatory changes. *See id* at 15–17 (providing an extensive list) (citing Doody Declaration ¶¶ 9–12). For example, common stock, notes, and warrants have been trading in the public market, financial statements have been issued, new financing agreements with senior secured lenders have

been formed, etc., all in reliance on the finality of Charter's bankruptcy proceedings. *See id.* at 17–19 (providing more examples of reliance on Confirmation Order).

**21.** Such a request is rendered *per se* equitably moot once a reorganization plan has been substantially consummated. *Cf. Freeman,* 2010 WL 6563101, at *5, 2010 U.S. Dist. LEXIS 21054, at *16 ("[T]his potential need for a new plan of reorganization would implicate the other factors and weigh in favor of finding this appeal equitably moot.... [U]nraveling the current Plan and implementing a new plan would be the very definition of knocking the props out from under the current Plan.")

and Mr. Allen."[22] Confirmation Order ¶ 152. Thus this Court cannot modify the Confirmation Order or the Plan to provide for the requested relief, not even to grant effective relief, without nullifying the Plan's authorization. *See Kenton County Bondholders Comm. v. Delta Air Lines, Inc. (In re Delta Air Lines, Inc.)*, 374 B.R. 516, 523 (S.D.N.Y.2007) (severance of settlement agreement incorporated into reorganization plan "would treat a non-severable provision ... as dispensable"); *see, e.g., Campbell v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 428 B.R. 43 (S.D.N.Y.2010); *In re Source Enterprises, Inc.*, 392 B.R. at 550; *In re Calpine Corp.*, 390 B.R. at 519.

Even if this Court could modify the Confirmation Order or the Plan, this Court would still be unable to make the desired modifications. The first problem is the effect on the CII Settlement. The requested relief requires modifying the CII Settlement, particularly the terms governing the consideration exchanged between Charter and Allen.[23] Such terms were the product of extensive negotiations and tradeoffs between a small number of sophisticated parties. The modifications, which bear on the very heart of the original agreement, are so fundamental and material that the meeting of the minds underlying the CII Settlement would cease to exist. Thus this Court cannot provide for the requested relief because the modifications would invalidate the CII Settlement as agreed to by the Settlement Parties, as well as approved by the voting constituencies and the Bankruptcy Court. *See, e.g., In re Delta Air Lines, Inc.*, 374 B.R. at 523 (severance of settlement agreement incorporated into reorganization plan "would ignore the tradeoff that allowed the parties to settle in the first instance").

The second problem is that the CII Settlement has been substantially, if not fully, performed. Allen, for example, has already done what he agreed he would do, enabling billions of dollars of wealth to be created for Charter and its stakeholders.[24]

---

**22.** Appellants characterize this language as boilerplate and based upon misplaced reliance on the Plan, but neither demonstrates that the Bankruptcy Court's factual findings regarding the relationships between the various provisions were clearly erroneous, or that it was a legal error to insert such a provision into the Confirmation Order. This Court thus accepts the Bankruptcy Court's factual findings and gives effect to the nonseverability and mutually dependent provision. Substantial consummation of a plan does moot the appeal of plan terms and provisions encompassed under a nonseverability clause because no appellant—including R² and LTD can then demonstrate the availability of effective relief. This result is plainly consistent with Second Circuit law, and it not for this Court to determine whether there should be a reprieve in certain circumstances.

**23.** CII Settlement expressly provides that Allen is to receive $375 million in cash and securities, $180 million of which compensates him for his participation and cooperation in generating $3 billion in value for Charter and its restructuring goals. The CII Settlement does not provide for any conditions under which Allen must return some or all of his settlement consideration, nor does it provide for any such payments to creditors. Appellants' requested remedies seek to alter what consideration and to whom Charter must pay for receiving over $3 billion in benefits.

**24.** (1) Allen did not exercise his pre-petition exchange rights; (2) Allen transferred his 30% interest in the preferred stock of CCVIII to Charter; (3) Allen caused CII to exchange a portion of its holdings in Holdco for shares of CCI common stock and cash in a taxable exchange; (4) Allen caused CII to merge with a subsidiary of CCI, with CII surviving as a wholly-owned subsidiary of CCI and Allen receiving shares of CCI stock; and (5) Allen continues to maintain a 35% voting interest in COO. Basta's Motion to Dismiss Declaration, Ex. A, ¶ 19; LDT–DR, Item 12, at 58 (post-effective date organizational and capital structure).

It would be inequitable to void his consideration payments from Charter because Allen is entitled to compensation for his detrimental reliance and performance.[25] It would additionally be inequitable to direct him to return even a portion of the consideration, or otherwise place him in a position where the bargain would be changed at this late stage.[26] The benefits received by Charter from Allen far outweigh Allen's recovery in settlement and sale/claim consideration.[27]

Granting the requested relief would both affect the re-emergence of Debtor Charter as New Charter and unravel the Plan. There could not have been a Plan without the CII Settlement. The CII Settlement was "a cornerstone of the Debtor's Plan." Confirmation Order ¶ 31. The Bankruptcy Court found that the CII Settlement was the basis upon which other Plan provisions were drafted and other parties agreed to lend their support. *Id.* ¶ 30 ("The Plan is premised upon the CII Settlement."); *In re Charter Commc'ns*, 419 B.R. at 252 ("The CII Settlement is a key component of the Plan that . . . is a necessary condition for Charter to reinstate its senior secured debt."). The Bankruptcy Court described the CII Settlement as not only

"a necessary component to the feasibility of the Plan," but also "an essential element of the Plan." Confirmation Order ¶ 39. In fact, absent its approval, the Bankruptcy Court opined that Charter would have "remain[ed] in bankruptcy, inevitably face[d] materially higher borrowing costs, and potentially forfeit[ed] billions of dollars in tax savings." *In re Charter Commc'ns*, 419 B.R. at 255.

Neither Appellant has demonstrated that any of the Bankruptcy Court's findings were clearly erroneous. The inevitable and unavoidable impact of the CII Settlement on the Plan is clearly borne out by the facts. Allen's voluntary assumption of duties and forbearance of rights under the CII Settlement was necessary for Charter to achieve its restructuring goals. Allen was solely responsible for the reinstatement of senior debt and the NOL future tax savings—the two goals that made the Plan possible. Allen also generated over $1 billion in other benefits that permitted Charter to, for example, pay distribution to certain claims and obtain operating capital for New Charter. Thus, invalidating an integral aspect of the Plan like the CII Settlement would nullify the

---

25. In fact, if directed to return that consideration, Allen would not only be able to seek such compensation from Charter, but he would be at liberty to engage in conduct that would force Charter to return to bankruptcy court like relinquishing his voting interest in COO. Either activity may not only threaten New Charter's vitality but may force New Charter to return to bankruptcy court.

26. R² has provided no basis to find that the Settlement Parties were obligated to strike an agreement at no more than Allen's reservation or "walk away" price. Thus, it is unclear how further proceedings in the Bankruptcy Court to determine if Allen would have accepted less consideration would be an effective remedy to cure unfairness. Similarly, LTD has provided no explanation for why it would be entitled to any consideration under

the CII Settlement, when it was not a party and neither its interests nor an involvement were implicated.

27. The Bankruptcy Court provided the following explanation for its approval of the CII Settlement: "[T]he numbers themselves are undeniably powerful. . . . The amounts to be paid to Mr. Allen, while significant in absolute dollars, are not excessive in comparison to what Charter is to receive. And that is the main economic reason for approving the CII Settlement. The direct and indirect value to the estate and its creditors outweighs by a high multiple the amounts allocated to Mr. Allen." *In re Charter Commc'ns*, 419 B.R. at 241. Neither Appellant has made a showing that these factual findings were clearly erroneous.

entire Plan.[28] The requested relief is not, as Appellants contend, an "intermediate option" that would not necessitate reversal or unraveling the Plan.

As a consequence, the very circumstances that the mootness presumption is designed to avoid in the bankruptcy context would occur.[29] First, New Charter would be forced back into bankruptcy to renegotiate a whole new plan as Debtor Charter—an undeniable threat to the vitality of any reemerged entity—because there would no longer be authorization for the reorganization or the numerous transactions consummated in reliance on the Plan. Second, this particular case would present the Bankruptcy Court with an untenable situation of an extraordinary magnitude because of, for example: (i) the sheer quantity, size, and in many instances irreversibility of consummated transactions in furtherance of and in reliance on

the Confirmation Order that would need to be unwound;[30] (ii) the ambitious and contentious nature of the original confirmation process; (iii) the need to compensate Allen for his completed performance of the CII Settlement *and* allow him the opportunity to walk away from Charter or otherwise decline to cooperate in achieving the restructuring goals.

Having failed to demonstrate the five *Chateaugay* factors, Appellants cannot as a matter of law rebut the mootness presumption. Accordingly, the Allen Settlement Claims, both as asserted by R[2] and LDT, are DISMISSED AS MOOT.

### 2. Nondebtor/Third–Party Releases Claim (R2)

The Nondebtor/Third–Party Release Claim is equitably moot for the same reasons articulated regarding the Allen

---

**28.** *See, e.g., In re Delta Air Lines, Inc.,* 374 B.R. at 523 (severance of settlement agreement incorporated into reorganization); *Six W. Retail Acquisition, Inc. v. Loews Cineplex Entm't Corp.,* 286 B.R. 239, 246 (S.D.N.Y. 2002); *Resolution Trust Corp. v. Best Prods. Co. (In re Best Prods. Co.),* 177 B.R. 791, 801–02 (S.D.N.Y.1995): *see also Texaco,* 92 B.R. at 46 (calling it a "common-sense notion" that the "piecemeal dismantling of the Reorganization Plan in subsequent appeals of individual transactions is, in practical terms if nothing else, a virtually impossible task") (internal quotation marks and citations omitted).

**29.** This is applicable to any claim or remedy that results in the nullification or renegotiation of Charter's Plan.

**30.** Charter poignantly demonstrates why unwinding the entire Plan would likely be impossible and certainly inequitable to Charter and third-parties:

Charter has already raised $1.6 billion dollars of funds based on the Plan, and used those funds to execute multiple postconfirmation transactions....Charter would have to return the $1.6 billion in new investment received from 193 new stockholders and

reclaim the 88.7 million shares of Class A stock which were given in exchange for that new investment as an initial matter.... Over 5 million shares have traded already, as well as hundreds of millions of dollars worth of bonds and hundreds of thousands of warrants ..., Similarly, Charter has now paid tens of millions of dollars in fees ..., tens of millions in interest payments to holders of CCH I and CCH II notes, and hundreds of millions to the holders of CCH II Notes as part of the notes exchange. If the Plan were invalidated on appeal, these disbursements would have to be returned to Charter—a daunting, if not impossible task.... Unwinding the Plan would further require the reinstatement of the old Charter common stock outstanding prior to November 30, 2009, which was delisted during the course of the chapter 11 cases and cancelled upon the Plan becoming effective.... And Charter obtained necessary regulatory approvals upon emergence from the FCC and other state and local governmental agencies (regarding the transfer of telecommunications licenses), all of which would have to be undone were the Plan overturned.

*See* 6/25/2010 Charter Br., at 21–23 (citations omitted).

Settlement Claim. The releases were granted to Allen and other parties as a "required" term of the CII Settlement. Confirmation Order ¶¶ 34, 44. The Bankruptcy Court also found that the releases were essential to the CII Settlement itself, as the releases were "very substantial consideration" for the Settlement parties' participation and independently vital, as they were "necessary to" and a "critical component of the Plan." [31] *In re Charter Commc'ns*, 419 B.R. at 258–59; Confirmation Order ¶¶ 42, 47.[32] Thus, the requested relief—striking the third party release provisions from the Plan[33] is not available in light of the necessary modifications to the CII Settlement.[34] Granting the requested relief would nullify and unravel the Plan.[35] R 2 cannot as a matter of law rebut the mootness presumption, and

therefore the Nondebtor Releases Claim is DISMISSED AS EQUITABLY MOOT.

## 3. Valuation Claim (R2)

The requested relief a standalone valuation of CCI with equity distributed to shareholders cannot be granted.[36] The Plan expressly provides for the classification and treatment of claims and interests in great detail. *See* Plan, Arts. III–IV. Class A–6 claims, the category in which R 2 falls as a CCI shareholder, were "cancelled, released, and extinguished" with the holders "receiv[ing] no distribution under the Plan." Plan, Art. IV–A(6) (c). Thus the previously discussed nonseverability and mutually dependent provisions in the Confirmation Order bars the modifications required to provide for the requested relief. *See, e.g., In re Calpine Corp.*, 390

**31.** In fact, with respect to the two pending appeals not being addressed, the Bankruptcy Court acknowledged this very point: "[T]he plan is predicated on the release, the very release that you seek to challenge.... You represent a real and present threat to the viability of the operation and to the integrity of the plan. You're more of a threat than if there were a pending appeal." Basta's Motion to Dismiss Declaration, Ex. C, at 20.

**32.** "[T]he enjoined claims would indirectly impact the Debtors' reorganization as many of the Debtor Releasees are beneficiaries of indemnity obligations (including, significantly [ ] Allen, in his capacity as a director of Debtor CCI) such that there is an identity of interest between the Debtors and other Debtor Releasees." Confirmation Order ¶ 47.

**33.** Although not determinative of the issue, it is important to note that R 2 never articulates how it was harmed by this provision. R 2 does not allege that it had or would like to pursue a claim that was enjoined by the third party releases.

**34.** Contrary to R 2's contention, whether it was legally permissible for the Confirmation Order to approve the third party releases— and hence whether the circumstances were truly unusual to render the releases themselves successful to the Plan—is a merits issue that is wholly irrelevant to the present analysis. The releases will unravel the Plan because of how they were integrated into the Plan—that is, through the CII Settlement as an important term. R 2 notably has failed to demonstrate that the Bankruptcy Court's factual findings on this issue were clearly erroneous, and thus R 2 has not provided a basis to carve out the provision to provide relief.

**35.** Such a finding is entirely consistent with other cases within this circuit rejecting attempts to challenge releases given as a part of a quid pro quo for a settlement important to the plan of reorganization. *See In re Delta Air Lines, Inc.*, 374 B.R. at 523–24 ("[T]hose releases were an integral part of the entire Settlement and cannot equitably be undone in isolation from the distributions to the Bondholders which the appellants do not seek to reverse."); *see also Metromedia*, 416 F.3d at 144; *Enron*, 326 B.R. at 503; *Texaco*, 92 B.R. at 45–50.

**36.** It is unclear whether the requested relief would actually constitute effective relief. CCI shareholders are subordinated to creditors. R 2 has made no showing that it would be guaranteed a recovery in the event that CCI was found to have some value.

B.R. at 519 (valuation request not effective relief given nonseverability provision).

Even if the Plan could be modified, granting the requested relief would be impermissible and doing so would nullify the Plan. A key issue of the reorganization was "the value of the reorganized Debtors, and how much equity in the reorganized Debtors would go to creditors and how much would go to shareholders." *In re Calpine*, 390 B.R. at 519. This Court "does not see how such relief will have only minimal interference to other interests or that it would not [inequitably] disturb numerous consummated transactions and further transactions taken in reliance thereon." *Id.* Changing the treatment of a particular group of shareholders or creditors, or even allowing the possibility for such changes, cannot be done in isolation irrespective of the nonseverability/mutually dependent provision. "Because the Plan was a way of distributing the limited assets of the debtor, any recovery would [necessarily] disrupt the recovery of [other constituencies entitled to distributions under the Plan] and require an entirely new reorganization plan." *Freeman*, 2010 WL 6563101, at *5, 2010 U.S. Dist. LEXIS 21054, at *16. Attempting to grant a recovery after the distributions have been made raises insurmountable concerns for the first three *Chateaugay* factors.[37] *See, e.g., In re Calpine*, 390 B.R. at 519–20 (discussing the complications of revaluation); *Loral Stockholders Protective Comm. v. Loral Space & Communs. Ltd. (In re Loral Space & Communs., Ltd.)*, 342 B.R. 132, 139 (S.D.N.Y.2006).

Granting the requested relief would also nullify the Plan because R 2's requested relief is premised upon a fundamental disagreement with how Charter decided to pursue the reorganization process. The Plan was designed based upon the understanding that "Charter is an integrated enterprise, and the financial condition of one affiliate affects the others." *In re Charter Commc'ns*, 419 B.R. at 251; *id.* at 261 ("[T]he business of Charter is managed by CCI on an integrated basis making it reasonable and administratively convenient to propose a joint plan"). The Plan simultaneously restructures CCI and its affiliated debtors based upon the enterprise level—that is, overall value, debt, tax savings, etc.—not standalone valuations. The requested relief requires this Court to find that the latter approach is legally required. Doing so would invalidate the Bankruptcy Court's approval of the distributions to creditors and shareholders, as well as the other terms of the Plan, all of which are wholly inconsistent with the standalone valuation approach. It would thus be necessary to unwind the current Plan and rewrite the Plan beginning anew.

Having failed to demonstrate the five *Chateaugay* factors, R 2 cannot as a matter of law rebut the mootness presumption. Accordingly, the Valuation Claim is DISMISSED AS EQUITABLY MOOT.

### 4. Improper Classification, Artificial Impairment, Absolute Priority Rule Claims (LDT)[38]

 Should LDT prevail on its claim that the CCI General Unsecured Claim

---

**37.** The practical implications of conducting a standalone valuation after the Plan's substantial consummation would, regardless of the outcome, affect New Charter's vitality and the risk for unraveling. R 2's argument the fact that the proceeding may be easy to orchestrate and that New Charter could afford an amount of relief for which R 2 provides no estimate—do not address the impact on the Plan or consummated transactions.

**38.** These claims are jointly considered because both claims are based upon the upon the same argument—that the Plan did not satisfy the requirements of 11 U.S. 1129(a) and seek the same relief—payment in full of

were not legitimately impaired, LDT would not be entitled to any relief. The Bankruptcy Court found, and LDT has not disputed that "given the Plan's structure, the requirement of section 1129(a)(10) would be satisfied even if [the CCI General Unsecured Claims at issue] were not deemed to be legitimately impaired." *In re Charter Commc'ns*, 419 B.R. at 266. The Plan "has been accepted by numerous other impaired accepting classes, thereby satisfying the requirement of section 1129(a)(10)." *Id.* Thus the alleged error could not have had a prejudicial effect on LDT or the confirmation process.[39]

If LDT was granted relief on any of the claims at issue (i.e. modifying particular classification provisions or awarding the payment of $300 million), the requested remedy would not be available. The non-severability and mutually dependent provisions in the Confirmation Order prevent this Court from modifying the distributions under the Plan. *See* Plan Art. IV (classifying claims and noting distribution entitlements). It is not possible to modify such a key issue of the reorganization without nullifying the Plan and requiring a negotiation of an entirely new plan. Too much speculation and guesswork would be involved in restoring LDT to the unknown position that it would have held had the Plan contained different provisions regarding LDT's treatment.[40] Aside from conclusory assertions, LDT has made no effort to demonstrate that doing so would not adversely affect and be grossly inequitable to creditors, shareholders, and other third-parties who have relied on the Confirmation Order.[41]

Finally, LDT's claims attack the entire Plan's validity, rather than some discrete aspect of the Plan. If the confirmation was improper due to the Plan's failure to satisfy one of the necessary confirmation or cramdown requirements of 11 U.S.C. § 1129, as LDT argues, this Court would have to find that the Plan's authorization was invalid and thus reverse the Confirmation Order. This Court would be unable to avoid forcing New Charter back into bankruptcy simply because LDT, the most structurally subordinated creditor, is willing to accept a seemingly less severe form of relief. In addition to the requested relief being unavailable, as previously discussed, such a finding would implicate all of the creditors and shareholders, as well as the participants in the innumerable post-effective date transactions, and necessitate a renegotiation of a new distribution scheme.

the CCI Noteholders' claims, or approximately $330 million in additional compensation.

**39.** To the extent that LDT seeks to argue as it did in opposition to the Confirmation that compliance should be tested on a per-debtor basis rather than a per-plan basis, this Court has already rejected this argument as a basis to rebut the mootness presumption.

**40.** "Had the Bankruptcy Court agreed that the Plan was not confirmable in light of improper classification or artificial impairment, that would have only put LDT back at the negotiating table. The outcome of a different, hypothetical negotiating process, however, is indeterminate—LDT might have receiv[ed] nothing at all. There is simply no way to know. This is especially true with regard to LDT, which was furthest removed from Charter's operating assets." 10/1/2010 Charter Br., at 10 n. 4. Accordingly, it is inappropriate to construe LDT's request as a mere *attempt* to recover a distribution to which it was or should have been entitled.

**41.** Contrary to LDT's assertion, LDT—not Charter or any of the other Appellees—bear the burden of demonstrating that the requested monetary judgement would not unwind the Plan. LDT does not satisfy such a burden by noting the value of New Charter's assets.

Having failed to demonstrate the five *Chateaugay* factors, LDT cannot as a matter of law rebut the mootness presumption. Accordingly, the Improper Classification, Artificial Impairment, and Absolute Priority Rule Claims are DISMISSED AS EQUITABLY MOOT.

### *CONCLUSION*

The motions to dismiss the appeal of Appellant R $^2$ Investments by Appellees Charter, Paul Allen, and the Official Committee of Unsecured Creditors are GRANTED. Appellant R $^2$'s appeal of the Bankruptcy Court's Confirmation Order is DISMISSED AS MOOT. The Clerk of the Court is directed to close 09–cv–10506.

The motions to dismiss the appeal of Appellant Law Debenture Trust by Appellees Charter, Paul Allen, and the Official Committee of Unsecured Creditors are GRANTED. Appellant LDT's appeal of the Bankruptcy Court's Confirmation Order is DISMISSED AS MOOT. The Clerk of the Court is directed to close 09–cv–10566.[42]

SO ORDERED.

---

42. This Court will issue a separate opinion regarding the remaining appeals, 10–cv–02929 and 10–cv–02930.