11-1710-bk, 11-1726-bk

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2011

(Argued: March 26, 2012    Decided: August 31, 2012)

Docket Nos. 11-1710-bk, 11-1726-bk

------------------------------------------------------x

In re CHARTER COMMUNICATIONS, INC.

------------------------------------------------------x

$R^2$ INVESTMENTS, LDC,

    Appellant,

-- v. --

CHARTER COMMUNICATIONS, INC., CCH I, LLC, CCH I CAPITAL CORPORATION, CCH II, LLC, CCH II CAPITAL CORPORATION,

    Debtors-Appellees,

PAUL G. ALLEN, OFFICIAL COMMITTEE OF UNSECURED CREDITORS,

    Appellees.

------------------------------------------------------x

LAW DEBENTURE TRUST COMPANY OF NEW YORK,

    Appellant,

-- v. --

CHARTER COMMUNICATIONS, INC., CCH I, LLC, CCH I CAPITAL CORPORATION, CCH II, LLC, CCH II CAPITAL CORPORATION,

    Debtors-Appellees,

PAUL G. ALLEN, OFFICIAL COMMITTEE OF UNSECURED CREDITORS,

    Appellees.[*]

------------------------------------------------------x

---

[*] The Clerk of the Court is directed to amend the official captions as set forth above, which reflects the true status of the parties.

Before:  WALKER, LYNCH and LOHIER, Circuit Judges.

Appellants Law Debenture Trust Company of New York ("LDT") and $R^2$ Investments, LDC ("$R^2$") appeal from an order of the United States District Court for the Southern District of New York (George B. Daniels, Judge) dismissing as equitably moot their appeals from the bankruptcy court order (James M. Peck, Bankruptcy Judge) confirming the Chapter 11 reorganization plan of Charter Communications, Inc. and its affiliated debtors.  See $R^2$ Invs., LDC v. Charter Commc'ns, Inc. (In re Charter Commc'ns, Inc.), 449 B.R. 14 (S.D.N.Y. 2011); JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns), 419 B.R. 221 (Bankr. S.D.N.Y. 2009).  We agree with the district court that it would be inequitable to grant LDT and $R^2$ the relief they seek now that the reorganization plan has been substantially consummated.  AFFIRMED.

LAWRENCE S. ROBBINS (Mark T. Stancil, Matthew M. Madden, on the brief), Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP, Washington, D.C., for Appellant $R^2$ Investments, LDC.

ANDREW W. HAMMOND, White & Case LLP, New York, N.Y., for Appellant Law Debenture Trust Company of New York.

JOHN C. O'QUINN, Kirkland & Ellis LLP, Washington, D.C. (Richard M. Cieri, Paul M. Basta, Kirkland & Ellis LLP, New York, N.Y., Jeffrey S. Powell, Daniel T. Donovan, Kirkland & Ellis LLP, Washington, D.C., on the brief), for Debtors-Appellees Charter Communications, Inc., CCH I, LLC, CCH I Capital

Corporation, CCH II, LLC, CCH II Capital Corporation.

JEREMY A. BERMAN (Robert E. Zimet, Jay M. Goffman, Sean J. Young, on the brief), Skadden, Arps, Slate, Meagher & Flom LLP, New York, N.Y., for Appellee Paul G. Allen.

DAVID S. ELKIND (Mark R. Somerstein, Keith H. Wofford, Darren Azman, on the brief), Ropes & Gray LLP, New York, N.Y., for Appellee Official Committee of Unsecured Creditors.

JOHN M. WALKER, JR., Circuit Judge:

On March 27, 2009, Charter Communications, Inc. ("CCI" and, together with its affiliated debtors, "Charter") filed what the Bankruptcy Court for the Southern District of New York (James M. Peck, Bankruptcy Judge) described as "perhaps the largest and most complex prearranged bankruptcies ever attempted, and in all likelihood . . . among the most ambitious and contentious as well." JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns), 419 B.R. 221, 230 (Bankr. S.D.N.Y. 2009). Following the bankruptcy court's confirmation of Charter's proposed plan of reorganization (the "Plan"), the Law Debenture Trust Company of New York ("LDT"), as indenture trustee for certain notes issued by CCI, and $R^2$ Investments, LDC ("$R^2$"), a CCI shareholder, appealed the confirmation order to the District Court for the Southern District of New York. The district court (George B. Daniels, Judge) dismissed those appeals under the doctrine of equitable mootness. $R^2$ Invs., LDC v. Charter Commc'ns, Inc. (In re

3

*Charter Commc'ns, Inc.*), 449 B.R. 14 (S.D.N.Y. 2011). LDT and R[2] now appeal that dismissal. We agree with the district court that the appeals are equitably moot and affirm.

**BACKGROUND**

We recite only those facts necessary to this appeal. A full recitation of the facts may be found in the district court and bankruptcy court opinions. See *In re Charter Commc'ns*, 449 B.R. 14; *In re Charter Commc'ns*, 419 B.R. 221.

In 2008, Charter, the nation's fourth-largest cable television company and a leading provider of cable and a broadband service, was operationally sound but carried almost $22 billion in debt at various levels of its corporate structure.[1] *In re Charter Commc'ns*, 419 B.R. at 230-31. After the September 2008 collapse of Lehman Brothers and the financial crisis that ensued, Charter could no longer service its debt due to the tightening credit markets, Charter's excessive leverage, and lower valuations of companies in the cable sector. *Id.* at 232-33. Charter began negotiating with Paul G. Allen, a major investor whose ownership stake gave him control of the company, and a group of junior bondholders (referred to as the "Crossover Committee"). *Id.* The negotiations culminated in a settlement (the "Allen Settlement") that contemplated

---

[1] Charter's corporate structure consisted of a publicly traded parent holding company, CCI, sitting atop a chain of subsidiaries. See Br. of Debtors-Appellees at 10. Charter's publicly traded debt was issued by eight holding companies stacked between CCI and Charter Communications Operating, LLC, the primary operating company. *Id.*

4

Charter's prenegotiated reorganization in bankruptcy.  Id.  Charter then filed for Chapter 11 bankruptcy, using the Allen Settlement as the cornerstone of its prenegotiated Plan.  Id.; 449 B.R. at 17. Left out of the negotiations, however, were LDT, the trustee for $479 million in aggregate principal of convertible notes issued by CCI; $R^2$, a CCI shareholder; and J.P. Morgan Chase N.A. ("JPMorgan"), the holder of Charter's senior debt.  These entities had no input into the Allen Settlement or the prepackaged Plan.  Id. at 17; 419 B.R. at 233.

To fully appreciate the key role Paul Allen played in Charter's reorganization requires delving a bit into the weeds of the negotiations underlying the Allen Settlement.  Charter's reorganization strategy was driven by the goal of reinstating its senior credit facility with JPMorgan--that is, curing any breaches in its contracts with JPMorgan so that JPMorgan would be classified as an unimpaired creditor.  See 11 U.S.C. § 1124(2).  Charter wanted to avoid renegotiating its senior debt during the financial turmoil of late 2008 and early 2009 because it believed such renegotiation would at best lead to a higher interest rate and at worst result in Charter being closed off to new financing altogether.  In re Charter Commc'ns, 419 B.R. at 233.  Charter thus needed to structure its reorganization in a way that would avoid triggering a default under the credit agreement with JPMorgan.  One condition Charter had consented to in the credit agreement was that Allen would retain thirty-five percent of the ordinary voting power

of Charter Communications Operating, LLC ("CCO"), the obligor under the senior credit agreements. Id. at 230, 237-38. For the reorganization plan to succeed, Charter thus needed to induce Allen to retain these voting rights, even though most of his investment in Charter would be wiped out. Id. at 230-31. In addition, for Charter to preserve roughly $2.85 billion of net operating losses, a valuable tax attribute, it needed Allen to forgo exercising contractual exchange rights and to maintain a one percent ownership interest in Charter Communications Holding Company, LLC ("Holdco"). Id. at 253. Because Charter's main goals in restructuring, namely reinstating its senior debt and obtaining tax savings though preserving net operating losses, required Allen's cooperation, Allen alone was in a position to provide "uniquely personal" benefits to Charter. Id. at 259.

Following "a spirited negotiation in which sophisticated adversaries and their expert advisors bargained with each other aggressively and in good faith," id. at 241, Charter, the Crossover Committee, and Allen agreed to the Allen Settlement. As part of the Settlement, Allen agreed to retain a thirty-five percent voting interest in CCO and a one percent ownership interest in Holdco, and to refrain from exercising his contractual exchange rights. Id. at 253-54. In return for these concessions, Allen would receive $375 million, of which $180 million was classified as pure settlement consideration. Id. at 241. The Allen Settlement further provided for a "$1.6 billion rights offering, a stepped-up tax basis in a

6

significant portion of [Charter's] assets, and the purchase of [Allen's]" preferred shares in CC VIII, LLC, a Charter subsidiary. Id. at 253. Allen also successfully negotiated for a liability release (other third parties, including the management of Charter, were released as well). Id. at 257-58 & n.26. Under the reorganization Plan that resulted from the Allen Settlement, the CCI noteholders, represented by LDT, would receive approximately 32.7 percent of their claims, id. at 242, and $R^2$ and other equity holders of CCI would receive nothing, see Debtor's Disclosure Statement at 33.

On November 17, 2009, after a nineteen-day hearing, the bankruptcy court overruled all objections and confirmed the Plan as submitted by Charter. 419 B.R. at 271. The following week, the bankruptcy court denied $R^2$ and LDT's motions for an emergency stay of the confirmation order. The district court (Sidney H. Stein, Judge, sitting in Part I) denied a stay pending appeal to that court, and the confirmation order and the Plan took effect on November 30, 2009. See In re Charter Commc'ns, 449 B.R. at 21. Charter immediately took actions under the Plan, including cancelling the equity issued by the prepetition Charter, issuing shares in the reorganized Charter, converting notes issued by the prepetition Charter entities into new notes, and issuing warrants to Charter's prepetition noteholders. Id. at 24 nn.19-20.

$R^2$ and LDT have objected to the Plan at every stage of these proceedings. Before the district court, they raised several

7

overlapping challenges to the Plan's confirmation. Their objections, viewed broadly, related to the Allen Settlement, the bankruptcy court's valuation of Charter, and compliance with the Bankruptcy Code's cramdown provisions for approving a plan over the objections of creditors. See id. at 21. Charter, Allen, and the Committee of Unsecured Creditors argued that, whatever the merit of R²'s and LDT's legal claims, the relief they sought could not be granted without upsetting the already-consummated Plan and that the doctrine of equitable mootness barred the appeals. Id. at 17. The district court agreed and dismissed the appeals as equitably moot. R² and LDT filed separate appeals from that dismissal, which were argued in tandem.

**DISCUSSION**

**I.   Legal Standard for Equitable Mootness**

This appeal concerns equitable mootness, a prudential doctrine under which the district court may dismiss a bankruptcy appeal "when, even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable." Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. Official Comm. of Unsecured Creditors of LTV Steel Co. (In re Chateaugay Corp.), 988 F.2d 322, 325 (2d Cir. 1993) ("Chateaugay I"). Unlike constitutional mootness, which turns on the threshold question of whether a justiciable case or controversy exists, equitable mootness in the context presented here is concerned with whether a particular remedy can be granted without unjustly

8

upsetting a debtor's plan of reorganization.  See Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136, 143-44 (2d Cir. 2005); see also In re UNR Indus., 20 F.3d 766, 769 (7th Cir. 1994) ("There is a big difference between inability to alter the outcome (real mootness) and unwillingness to alter the outcome ('equitable mootness')."). Equitable mootness in the bankruptcy setting thus requires the district court to carefully balance the importance of finality in bankruptcy proceedings against the appellant's right to review and relief.  See Chateaugay I, 988 F.2d at 325-26; Bank of N.Y. Trust Co., NA v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.), 584 F.3d 229, 240 (5th Cir. 2009) (noting that equitable mootness is "a judicial anomaly" because it creates an exception to courts' "virtually unflagging obligation to exercise jurisdiction" (internal quotation marks omitted)).  "[E]quitable mootness applies to specific claims, not entire appeals" and must be applied "with a scalpel rather than an axe."  In re Pac. Lumber, 584 F.3d at 240-41.

In this circuit, an appeal is presumed equitably moot where the debtor's plan of reorganization has been substantially consummated.  Aetna Cas. & Sur. Co. v. LTV Steel Co. (In re Chateaugay Corp.), 94 F.3d 772, 776 (2d Cir. 1996) ("Chateaugay III"); Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.), 10 F.3d 944, 952-53 (2d Cir. 1993) ("Chateaugay II").  "Substantial consummation" is defined in the Bankruptcy Code to require that all

or substantially all of the proposed transfers in a plan are consummated; that the successor company has assumed the business or management of the property dealt with by the plan; and that the distributions called for by the plan have commenced. See 11 U.S.C. § 1101(2).

The presumption of equitable mootness can be overcome, however, if all five of the "Chateaugay factors" are met:

> (1) "the court can still order some effective relief";
>
> (2) "such relief will not affect the re-emergence of the debtor as a revitalized corporate entity";
>
> (3) "such relief will not unravel intricate transactions so as to knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the Bankruptcy Court";
>
> (4) "the parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings"; and
>
> (5) "the appellant pursued with diligence all available remedies to obtain a stay of execution of the objectionable order if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from."

Chateaugay II, 10 F.3d at 952-53 (internal citations, quotations, and alterations omitted). Substantial consummation thus "does not necessarily make it impossible or inequitable for an appellate court to grant effective relief." Id. at 952. Nor is a claim automatically equitably moot if the relief requested would require that a confirmed plan be altered. In this regard, we disagree with the district court's overly broad statement that invalidating a plan and remanding for renegotiation renders a request "per se

10

equitably moot." In re Charter Commc'ns, 449 B.R. at 24 n.21. The Chateaugay factors ensure that there is no per se equitable mootness by requiring a court to examine the actual effects of the requested relief. Finally, in examining a debtor's contention that a claim is equitably moot, we cannot rely solely on the debtor's conclusory predictions or opinions that the requested relief would doom the reorganized company. Instead, Chateaugay II requires an analytical inquiry into the likely effects of the relief an appellant seeks and must be based on facts. Only if all five Chateaugay factors are met, and if the appellant prevails on the merits of its legal claims, will relief be granted.

## II.   Standard of Review

We turn first to the standard of review in appeals of equitable mootness determinations.[2] Generally in bankruptcy appeals, the district court reviews the bankruptcy court's factual findings for clear error and its conclusions of law de novo. Fed. R. Bankr. P. 8013. On appeal to this court, we ordinarily review

---

[2] No published Second Circuit decision has addressed this question directly. In a non-precedential summary order we determined that abuse of discretion review was appropriate. See Ad Hoc Comm. of Kenton Cnty. Bondholders v. Delta Air Lines, Inc., 309 F. App'x 455, 457 (2d Cir. 2009). In prior decisions we have described the general standard of review in bankruptcy cases, involving de novo review of legal conclusions, and then proceeded to address equitable mootness without further discussion or application of a particular standard of review. See, e.g., In re Metromedia, 416 F.3d at 139; South St. Seaport Ltd. P'ship v. Burger Boys, Inc. (In re Burger Boys, Inc.), 94 F.3d 755, 759 (2d Cir. 1996); Resolution Trust Corp. v. Best Prods. Co. (In re Best Prods. Co.), 68 F.3d 26, 29 (2d Cir. 1995). To the extent these cases suggested that de novo review may apply to district court determinations regarding equitable mootness, they did so in dicta.

the district court's decision de novo.  In re Metromedia, 416 F.3d at 139.  Equitable mootness appeals arise in a somewhat different procedural posture: in an equitable mootness dismissal, the district court is not reviewing the bankruptcy court at all, but exercising its own discretion in the first instance.  In so doing, the district court may rely on the bankruptcy court's factual findings, unless clearly erroneous, and if necessary receive additional evidence.  Perhaps because of the unusual nature of equitable mootness dismissals, the courts of appeals are split over whether a de novo or abuse of discretion standard of review should be applied by a court of appeals.  Compare Curreys of Neb., Inc. v. United Producers, Inc. (In re United Producers, Inc.), 526 F.3d 942, 946-47 (6th Cir. 2008) (reviewing determination of equitable mootness de novo), Liquidity Solutions, Inc. v. Winn-Dixie Stores, Inc. (In re Winn-Dixie Store, Inc.), 286 F. App'x 619, 622 & n.2 (11th Cir. 2008) (same), and United States v. Gen. Wireless, Inc. (In re GWI PCS 1 Inc.), 230 F.3d 788, 799-800 (5th Cir. 2000) (same), with Search Mkt. Direct, Inc. v. Jubber (In re Paige), 584 F.3d 1327, 1334-1335 (10th Cir. 2009) (reviewing determination of equitable mootness for abuse of discretion), and Nordhoff Invs., Inc. v. Zenith Elecs. Corp., 258 F.3d 180, 182 (3d Cir. 2001) (same).

We join those circuits that apply an abuse-of-discretion standard, finding it significant that we are reviewing the district court's own exercise of discretion as to whether it is practicable

to grant relief. A somewhat analogous situation arises when Article III mootness turns on the defendant's voluntary cessation of allegedly illegal conduct. There, the voluntary cessation "bear[s] on whether the court should, in the exercise of its discretion, dismiss the case as moot." Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo, 981 F.2d 50, 59 (2d Cir. 1992). In such a case, because dismissal "lies within the sound discretion of the district court," we review for abuse of discretion. Id.; Granite State Outdoor Adver., Inc. v. Zoning Bd. of Stamford, 38 F. App'x 680, 683 (2d Cir. 2002); cf. In re Paige, 584 F.3d at 1334-35 (reviewing equitable mootness for abuse of discretion in part because of its similarities to prudential mootness, reviewed in the Tenth Circuit for abuse of discretion). More generally, equitable mootness determinations involve "a discretionary balancing of equitable and prudential factors," the type of determination we usually review for abuse of discretion. In re Cont'l Airlines, 91 F.3d 553, 560 (3d Cir. 1996) (en banc). Accordingly, we will review the district court's decision for abuse of discretion.

**III. Objections to the Allen Settlement and Third-Party Releases are Equitably Moot**

$R^2$ and LDT both challenge the compensation Paul Allen received under the Allen Settlement as contravening the absolute priority rule and Delaware's entire fairness standard. They further argue that the third-party releases, which originated in the Allen Settlement and were incorporated into the confirmed Plan, do not

13

comply with SEC v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.), 960 F.2d 285, 293 (2d Cir. 1992), limiting third-party releases to unique circumstances. Appellants claim that these legal errors can be redressed through a prospective monetary award, without undoing the Allen Settlement or reopening the bankruptcy proceedings. LDT suggests that Allen be required to disgorge some or all of his $180 million in settlement consideration, or that Charter pay a similar amount directly to LDT. $R^2$ presents a different alternative: that the bankruptcy court determine the lowest payout Allen would have been willing to accept, and order him to disgorge the excess. And $R^2$ maintains that the third-party releases can be surgically excised from the Allen Settlement and the Plan.

We begin by noting that LDT and $R^2$ have met their burden with respect to several of the Chateaugay factors. First, it is not impossible to grant LDT and $R^2$ relief, in the sense that the appeals are not constitutionally moot (factor 1). See Dean v. Blumenthal, 577 F.3d 60, 66 (2d Cir. 2009) (claims for monetary relief automatically avoid constitutional mootness). Next, LDT and $R^2$ were diligent in seeking a stay of the confirmation order (factor 5).[3] That LDT and $R^2$ were not granted a stay does not affect the analysis

---

[3] Although no stay was sought from this court, under the circumstances we do not fault LDT and $R^2$ for the omission: the district court denied a stay on the evening of Wednesday November 25, 2009, the day before Thanksgiving, and this court was closed until the following Monday when the Plan became effective and was substantially consummated, leaving no time to move this court for a stay.

under Chateaugay II, which looks only to diligence in seeking a stay. Chateaugay II, 10 F.3d at 954; In re Metromedia, 416 F.3d at 144-45.

Next, LDT and $R^2$ are correct that the relief they seek would not adversely affect parties without an opportunity to participate in the appeal (factor 4). See Chateaugay II, 10 F.3d at 953. Even assuming that the relief requested would send Charter back into bankruptcy, the parties most affected would be Charter itself, Allen, and Charter's creditors, all of whom are either parties to this appeal or participated actively in the bankruptcy proceedings. Cf. Kenton Cnty. Bondholders Comm. v. Delta Air Lines, Inc. (In re Delta Air Lines, Inc.), 374 B.R. 516, 524 (S.D.N.Y. 2007) (finding appeal of a settlement equitably moot in part because distributions under the settlement had been made to innocent third parties that were not participating in the appeal). In any event, if the Allen Settlement were unlawful, it would not be inequitable to require the parties to that agreement to disgorge their ill-gotten gains, participation in the appeal or not. See Motor Vehicle Cas. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.), 677 F.3d 869, 882 (9th Cir. 2012) ("[T]he question is not whether . . . no third party interests are affected" but whether any effects on third parties would be inequitable.). Likewise, striking the third-party releases from the Plan would affect only those third parties that benefited from the releases. See Hilal v. Williams (In re Hilal), 534 F.3d 498, 500 (5th Cir. 2008); Gillman v. Cont'l Airlines (In

15

re Cont'l Airlines), 203 F.3d 203, 210 (3d Cir. 2000) (finding appeal of third-party releases not equitably moot where the defendant presented no arguments that investors or creditors relied on the presence of releases in supporting the plan). Less direct effects may be felt by reorganized Charter's shareholders, since either a limited remand or a payout would affect the value of the company. However, Charter has regularly and fully disclosed the existence of this appeal and the possibility of an adverse ruling as a risk factor in publicly filed annual and quarterly reports. See, e.g., Charter Communications, Inc., Annual Report (Form 10-K), at 29 (Mar. 1, 2011). A prudent investor would take this information into account before purchasing shares in Charter. See In re Cont'l Airlines, 91 F.3d at 572 (Alito, J., dissenting).

However, LDT and $R^2$ have failed to establish that the relief they request would not affect Charter's emergence as a revitalized entity and would not require unraveling complex transactions undertaken after the Plan was consummated (factors 2 and 3). See Chateaugay II, 10 F.3d at 953. $R^2$ and LDT are correct that any disgorgement by Allen would not impact reorganized Charter's financial health. And, as Appellants stress, reorganized Charter has been quite successful, with substantial assets and cash flow, access to an $800 million revolving line of credit, and long-term debt structured on favorable terms. Charter makes no claim that a payment in the range of $200 million would send it spiraling back into bankruptcy. LDT and $R^2$ ignore, however, that we must also

16

consider the heavy transactional costs associated with the monetary relief they seek. Modifying the terms of the Allen Settlement, including striking the releases, would be no ministerial task. The Allen Settlement was the product of an intense multi-party negotiation, and removing a critical piece of the Allen Settlement—such as Allen's compensation and the third-party releases—would impact other terms of the agreement and throw into doubt the viability of the entire Plan. See In re Metromedia, 416 F.3d at 145.

LDT and $R^2$ maintain that in refusing to alter the Allen Settlement, the district court gave too much weight to the nonseverability clause contained in the Settlement and the Plan. See In re Charter Commc'ns, 449 B.R. at 20, 24-25, 25 n.22, 28-29, 30. We agree with LDT and $R^2$ that normally a nonseverability clause standing on its own cannot support a finding of equitable mootness. Allowing a boilerplate nonseverability clause, without more, to determine the equitable mootness question would give the debtor and other negotiating parties too much power to constrain Article III review. See Nordhoff Invs., Inc., 258 F.3d at 192 (Alito, J., concurring in the judgment) (expressing concern that the "equitable mootness doctrine can easily be used as a weapon to prevent any appellate review of bankruptcy court orders confirming reorganization plans"). Given the ubiquity of nonseverability clauses in prenegotiated plans, such a rule could moot virtually every appeal where a stay had not been granted. See $R^2$ Br. at 41-42

17

& 42 n.10 (noting that of the top ten prenegotiated bankruptcies filed in 2010 by value of the debtor's assets, each contained a nonseverability clause in either the confirmation order or in the reorganization plan).  More importantly, equitable mootness is a practical doctrine that requires courts to consider the actual effects of the relief requested on a debtor's emergence from bankruptcy.  While a nonseverability clause may be one indication that a particular term was important to the bargaining parties, a district court cannot rely on such a clause to the exclusion of other evidence.[4]  See Trans World Airlines, Inc. v. Texaco, Inc. (In re Texaco, Inc.), 92 B.R. 38, 47-49 (S.D.N.Y. 1988) (looking to both nonseverability clause and testimony about the importance of release provisions to determine that severing the provisions "would undermine both the Settlement Agreement and the Reorganization Plan"); see also Behrmann v. Nat'l Heritage Found., 663 F.3d 704, 713-14 (4th Cir. 2011) (finding an appeal of a release provision not equitably moot where the bankruptcy court concluded that the releases were "important" to the Plan without adequate factual support).

---

[4] Reliance on the nonseverability clause alone would be particularly inappropriate here with respect to the third-party releases because the "term sheet" incorporated into the Allen Settlement expressly provided that the debtors' failure to secure the releases as part of the approved Plan would not breach the Allen Settlement.  These dueling contractual provisions only underscore the need to examine the totality of evidence to determine the importance of a particular provision.

In these appeals, however, the district court did not rest its decision exclusively on the nonseverability clause. The bankruptcy court found that the compensation to Allen and the third-party releases were critical to the bargain that allowed Charter to successfully restructure and that undoing them, as the plaintiffs urge, would cut the heart out of the reorganization. Crediting multiple witnesses, it also found that Allen was in a unique position to create a successful arrangement because only through his forbearance of exchange rights and agreement to maintain voting power could Charter reinstate its senior debt and preserve valuable net operating losses. See Findings of Fact, Conclusions of Law, and Order Confirming Debtors' Joint Plan of Reorganization ("Conf. Order") ¶¶ 32, 43; see also JA 462, 589, 605, 611. The releases, like the compensation, were important in inducing Allen to settle. See Conf. Order ¶ 32; see also JA 463, 589, 605, 611. In the face of witnesses representing that the releases and compensation were important to Allen, LDT and $R^2$ can point to no evidence that the settlement consideration paid to Allen or the third-party releases were simply incidental to the bargain that was struck. Compare In re Metromedia, 416 F.3d at 145 (request to strike third-party releases equitably moot because "it [was] as likely as not that the bargain struck by the debtor and the released parties might have been different without the releases") with In re Cont'l Airlines, 203 F.3d at 210-11 (appeal of third-party releases not equitably moot where there was "[n]o evidence or arguments . . . that

19

Plaintiffs' appeal, if successful, would necessitate the reversal or unraveling of the entire plan of reorganization").

Even if LDT and $R^2$ are correct that the settlement consideration and releases are legally unsupportable, these provisions could not be excised without seriously threatening Charter's ability to re-emerge successfully from bankruptcy.[5]  Nor could the monetary relief requested be achieved by a quick, surgical change to the confirmation order.  Allen may not be willing to give up the benefit he received from the Allen Settlement without also reneging on at least part of the benefit he bestowed on Charter.  Thus the parties would have to enter renewed negotiations, casting uncertainty over Charter's operations until the issue's resolution.  We therefore find no abuse of discretion in the district court's conclusion that these claims relating to the Allen Settlement are equitably moot.

**IV.  $R^2$'s Claim for the Revaluation of CCI is Equitably Moot**

$R^2$'s next claim of error relates to the valuation of Charter. The bankruptcies of Charter's 131 affiliated entities were consolidated for procedural, not substantive, purposes.  419 B.R. at 269-70.  The Plan, however, values all Charter entities as one.

---

[5] This risk—supported in the record—that the parties might be unable to compromise if the bankruptcy proceedings were reopened, is what we understand the district court to have meant when it wrote that relief would "nullify the plan."  See 449 B.R. at 24, 25, 26, 27 n.29, 28.  Technically speaking, any vacatur of a confirmation order, no matter how limited, would "nullify" the plan, at least temporarily and in part, but we understand the district court's use of "nullification" to have referred to a nullification of the ability to reorganize at all.

Id. $R^2$, an equity holder in CCI, argues that CCI should have been valued separately, taking into account the value of the net operating losses, which $R^2$ argues "belong" to CCI. Here again, $R^2$ claims that simple relief is available: remand the case to the bankruptcy court for a limited valuation of CCI as a stand-alone entity, and distribute any surplus to CCI's shareholders, $R^2$ among them.

As with challenges to the Allen Settlement, $R^2$ has met the Chateaugay factors relating to ability to grant effective relief, diligence in seeking a stay, and effect on third parties. However, we could not grant the relief $R^2$ seeks without requiring a significant revision of Charter's reorganization. $R^2$'s argument is, in effect, an attack on the bankruptcy court's determination that it was appropriate for the Plan to consider all the Charter entities together, even though the bankruptcies were never substantively consolidated. In order to grant a separate valuation of CCI, the district court would have had to overturn the bankruptcy court's determination that a joint Plan was appropriate. That legal conclusion would require not just that CCI be separately valued, but that all the Charter subsidiaries be revalued and the proceeds of the bankruptcy distributed accordingly. See Compania Internacional Financiera S.A. v. Calpine Corp. (In re Calpine Corp.), 390 B.R. 508, 519-20 (S.D.N.Y. 2008) (holding that the debtor's valuation was a "'key issue'" in a reorganization, and therefore even if a remand resulted in a higher valuation, the plan

would need to be substantially changed), aff'd 354 F. App'x 479 (2d Cir. 2009). This is not the type of relief that can be undertaken without knocking the props out from under completed transactions or affecting the re-emergence of the debtor from bankruptcy.[6] See Chateaugay II, 10 F.3d at 952-53. Thus, the district court did not abuse its discretion in dismissing this claim for revaluation of CCI as equitably moot.

**V.  LDT's Claim that the Plan Violates 11 U.S.C. § 1129's Cramdown Provisions is Equitably Moot**

LDT appeals the bankruptcy court's determination that the Plan complies with the cramdown provisions of 11 U.S.C. § 1129. First, LDT argues that, as a creditor of CCI, it had a more senior claim to the value of the net operating losses than the Crossover Committee members, who held the debt of other Charter entities. See § 1129(b)(2)(B)(ii). Second, LDT argues that creditors were "gerrymandered" into separate classes to satisfy the provisions of § 1129(a)(10), which requires that at least one class of impaired

---

[6] The district court erred, however, when it held that the relief requested could not be granted because the confirmation order rendered $R^2$'s claims "cancelled, released, and extinguished" with the holders "receiving no distribution under the Plan." 449 B.R. at 28 (internal quotation marks and alteration omitted). When the confirmation order is on appeal, the legal effects of that order—such as extinguishing equity—cannot themselves preclude review. See Chateaugay II, 10 F.3d at 953-54, (rejecting the argument that because the confirmation order provided that certain assets were to re-vest in the debtor "free and clear of all claims and interests" we could not correct a legal error in their distribution (internal quotation marks omitted)). Nevertheless, the district court's alternative holding that equitable mootness barred the appeal notwithstanding the this provision was independently sufficient to support its judgment.

22

creditors accept a plan. It further argues that the bankruptcy court erred by holding that § 1129(a)(10) was satisfied if an impaired class of <u>any</u> of the debtors accepted the Plan. As relief for all these alleged errors, LDT seeks the payment in full of the CCI notes, at a cost to Charter of about $330 million. 449 B.R. at 29 n.38.

As with $R^2$'s claims regarding valuation, LDT may be correct that the simple payment of $330 million would satisfy the <u>Chateaugay</u> factors. However, as with $R^2$'s revaluation claim, the legal conclusions required to find for LDT would require much more than simply paying the CCI Noteholders' claims in full. The legal errors that LDT alleges, if proven, would require unwinding the Plan and reclassifying creditors. This is the opposite of a surgical change to the Plan. <u>See</u> <u>In re Pac. Lumber</u>, 584 F.3d at 251 (finding claims of artificial impairment and misclassification of creditors equitably moot because "no remedy . . . is practicable other than unwinding the plan"). We therefore affirm the district court's exercise of its discretion in dismissing the claim that the cramdown provisions were violated as equitably moot as well.

## CONCLUSION

For the foregoing reasons, the district court's order dismissing LDT and $R^2$'s appeals as equitably moot is AFFIRMED.

23