In re ION MEDIA NETWORKS,
INC., et al., Debtors.

Cyrus Select Opportunities Master
Fund, Ltd., Appellant,

v.

Ion Media Networks, Inc., Appellee.

Bankruptcy No. 09–13125 (JMP).
No. 09–cv–10596 (BSJ).

United States District Court,
S.D. New York.

Oct. 10, 2012.

J. Christopher Shore, White & Case LLP, New York, NY, Thomas E. Lauria, White & Case LLP, Miami, FL, for Cyrus Select Opportunities Master Fund, Ltd.

Alexis Freeman, Akin Gump Strauss Hauer & Feld LLP, New York, NY, Jonathan S. Henes, Kirkland & Ellis LLP, Los Angeles, CA, for Ion Media Networks, Inc.

### *Memorandum and Order*

BARBARA S. JONES, District Judge.

On December 3, 2009, pursuant to a memorandum decision dated November 24, 2009, the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court") entered an Order Confirming the Debtors' Fourth Modified Joint Plan of Reorganization (the "Plan"). Appellant Cyrus Select Opportunities Master Fund, LTD ("Appellant" or "Cyrus"), now appeals this Order. For the reasons set forth below, the appeal is DISMISSED.

### BACKGROUND

Appellees ION Media Networks, Inc. ("Appellees" or "ION"), and its debtor affiliates (collectively "Debtors")[1] comprise a broadcasting company that owns and operates 59 broadcast television stations in the United States. (Appellant's Br. at 4.) Appellant is an investor that "purchased certain deeply discounted second lien debt of [ION] for pennies on the dollar."[2] (Ap-

---

1. The Debtors include ION and special-purpose subsidiaries that held FCC broadcast licenses. (Appellant's Br. at 4.) Appellees are the reorganized Debtors under the Plan, including the debtor in possession ("DIP") Lenders and the Initial Consenting First Lien Lenders as the new equity owners of the reorganized ION.

2. The Bankruptcy Court also noted that this appeal is the latest in a series of "aggressive

pellant's Br., Ex 2 ("Confirmation Decision"), at 4.)

In 2005, Debtors borrowed $725 million in first priority secured debt and $405 million in second priority secured debt. As part of this financing, Debtors entered into an agreement (the "Security Agreement") with agents of the first and second lien lenders that granted their respective agents security interests in Debtors' collateral. (*See* Appellant's Br., Ex. 5.) The Security Agreement defines "Collateral" as all currently owned or after-acquired property, including all FCC licenses and all general intangibles, as well as proceeds derived from that property. (Appellant's Br., Ex. 5 § 2.1.) Security interests under the agreement do not include "Excluded Property," which is defined as "Special Property" including "any permit, lease, license agreement or other personal property held by any Grantor to the extent that any Requirement of Law applicable thereto prohibits the creation of a security interest therein." (*Id.* at § 1.1.) The Security Agreement granted first priority secured parties ("First Lien Lenders") a "first priority senior security interest" in the Collateral and reserved a "second priority interest" in the Collateral for second priority secured parties ("Second Lien Lenders") that is "fully junior, subordinated and subject to the security interest granted to" the First Lien Lenders. (*Id.*

at § 2.3.) Appellant is a Second Lien Lender under the Security Agreement.

On May 19, 2009, the Debtors entered bankruptcy under Chapter 11 and made a motion for debtor-in-possession (DIP) financing. (Confirmation Decision at 8.) The Debtors and First Lien Lenders entered into a Restructuring Support Agreement ("RSA"), which provided that the First Lien Lenders would provide $150 million in DIP financing in return for almost all of the common stock of the reorganized Debtors. (*Id.*) Over Appellant's objection, the Bankruptcy Court entered a final order approving DIP financing on July 6, 2009. (*See* Appellee's Br., Ex. 3 ("Confirmation Order").) This order stated that the First Lien Holders' debt was secured by "priority liens on and security interests in substantially all of the Debtors' assets." [3] (*Id.* at 10.)

Debtors filed a joint Chapter 11 plan and disclosure statement on August 19, 2009.[4] (Confirmation Decision at 11.) At that time, the First Lien Lenders were owed over $850 million. (*Id.*) Consistent with the RSA, the Plan provided that the First Lien Lenders would receive nearly all of the common stock of the reorganized Debtors;[5] the Second Lien Lenders (including Appellant) and general unsecured creditors would receive a *pro rata* share of a cash distribution and warrants to purchase 5% of common stock in the reorga-

---

bankruptcy litigation tactics" designed to "earn outsize returns on its bargain basement debt purchases." (Confirmation Decision at 4.) Like the Bankruptcy Court, this Court recognizes that such "activist strategies" are not improper. (*Id.*) They do, however, provide context to the Court's evaluation of the equitable considerations in this case.

**3.** The Bankruptcy Court's Order provided that it would be binding on all parties unless contested no later than September 21, 2009. (Confirmation Order ¶ 4.) In order to file a contest, a lender was required to seek deriva-

tive standing. (*Id.* ¶ 23.) Appellant failed to take any action seeking this standing before or after filing its objection. (Confirmation Decision at 18.)

**4.** This plan was followed by four modifications resulting in the final Plan filed on December 2, 2009.

**5.** This equity distribution was based on an enterprise valuation of the reorganized Debtors of between $310 million and $455 million. (Confirmation Decision at 11.)

nized Debtors; and all claims against Debtors stemming from the bankruptcy proceedings by holders of claims or interests would be released (the "non-debtor releases"). (*Id.*) The Bankruptcy Court noted that the "Plan presumes that the First Lien Lenders are entitled under the [Security and Intercreditor Agreements] to receive the value [of] all of the assets of the [special-purpose subsidiaries], including the FCC Licenses." (*Id.* at 11–12.)

Debtors also filed an adversary proceeding to enjoin Appellant from: "(a) contesting the validity or enforceability of any lien, mortgage, assignment or security interest granted on all of the Debtors' property to the First Lien Lenders; (b) contesting the priority rights granted to the First Lien Lenders under the Security Agreement; and (c) opposing or objecting to the Debtors' Plan and Disclosure Statement." (Appellant's Br. at 7.) One month later, on September 19, 2009, Appellant commenced a companion adversary proceeding against Debtors and filed a motion in this Court to withdraw the bankruptcy reference, contending that no liens existed on the FCC Licenses or the proceeds thereof.[6] (*Id.* at 8.) This Court (Stein, J.) denied the Motion to Withdraw, finding that the Bankruptcy Court was competent to rule on the extent of liens on the FCC licenses. (*Id.* at Ex. 10.)

On October 15, 2009, Debtors and Appellant filed cross motions for summary judgment in the Bankruptcy Court addressing the lien issue. (Appellant's Br. at 9.) Following oral argument, the Bankruptcy Court reserved decision on the motions. (*Id.*) On October 28, 2009, Appellant filed an objection to the Plan arguing that the Plan could only be confirmed if the Bankruptcy Court first ruled on the summary judgment motions and that the Plan failed otherwise to preserve Cyrus's rights in the pending adversary proceedings. (*Id.* at Ex. 16.) On November 3, 2009, the Bankruptcy Court issued a preliminary ruling that "Cyrus lacked standing to object to the Debtors' Plan on the basis that, whether or not any lien was granted, Cyrus waived its right to object and the Intercreditor Agreement precluded Cyrus from contesting the validity and enforceability of the security interests on the FCC Licenses."[7] (Confirmation Decision at 13–14.)

On December 3, 2009, the Bankruptcy Court issued the Confirmation Order and Appellant filed a notice of appeal. (Dkt. 1.) Appellant also sought a stay of the order from the Bankruptcy Court pending appeal, which was denied. Next, Appellant moved for an Order to Show Cause in this Court, seeking a stay and expedited appeal. This Court denied the motion, holding that "(1) Cyrus lack[ed] standing to contest the priority of the First Lien Lenders' claims under the terms of the Intercreditor Agreement, and (2) the First Lien Lenders have a security interest in the FCC licenses—and thus have priority over the Second Lien Lenders—to the ex-

---

**6.** Appellant argued that the issue of whether any liens existed on the FCC licenses would implicate the Federal Communications Act, 47 U.S.C. §§ 151, *et seq.*, and therefore that issue should be resolved prior to the Debtor proceeding with their Plan. (Appellant's Br. at 8.) Noting that Debtors were proceeding with the Plan, Appellant argued that a determination by the Bankruptcy Court on the issue of liens on the FCC licenses might become equitably moot if the Plan was consummated. *Id.*

**7.** The Bankruptcy Court also opined that, even if Cyrus were not precluded from contesting the liens, "the First Lien Lenders' claims ... are of higher priority than the Second Lien Lenders' claims...." (Confirmation Decision at 14.) In denying Appellant's request for a stay, this Court agreed. (*See* Appellee's Br., Ex. 1 at 4–5.)

tent permitted by law." (Appellee's Br., Ex. 1 at 4–5.)

On December 15, 2009, Appellant petitioned the Second Circuit for a stay. That court referred the matter to the next available panel and granted a temporary stay pending resolution by the panel. (Appellant's Br. at 12.) On December 17, 2009, however, Debtors moved to vacate the stay, citing a letter agreement that permitted the termination of a programming contract if Debtors did not exit bankruptcy by December 20, 2009. (*Id.*) The Second Circuit granted the Motion to Vacate on December 18, 2009. Debtors then took steps to implement and consummate the Plan, including filing a notice in the Bankruptcy Court of its effectiveness.[8]

## DISCUSSION

The issues presented on appeal are whether (1) Debtors or Appellant breached the Security Agreement; (2) the non-debtor releases granted to the prepetition lenders were permissible; and (3) these issues are rendered equitably moot by the consummation of the Plan.[9] (Appellant's Reply Br. at 2.) The Court first considers the threshold question of equitable mootness.

## I. Equitable Mootness

■■■ Equitable mootness is a prudential doctrine that limits the authority of an appellate court to disturb a reorganization plan once it has been "substantially consummated."[10] *In re Chateaugay Corp.* (*Chateaugay III* ), 94 F.3d 772, 776 (2d Cir.2006); *see also In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 144 (2d Cir.2005). Once a reorganization plan is substantially consummated, courts presume that an appeal of the plan's confirmation is equitably moot. *In re Charter Commc'ns, Inc.*, 691 F.3d 476, 482 (2d Cir.2012); *see also Upstream Energy Servs. v. Enron Corp.* (*In re Enron* ), 326 B.R. 497, 502 (S.D.N.Y.2005).

■■■ This presumption can be overcome only if "all of the following circumstances exist: (a) the court can still order some effective relief; (b) such relief will not affect the re-emergence of the debtor as a revitalized corporate entity; (c) such relief will not unravel intricate transactions so as to knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the Bankruptcy Court; (d) the parties who would

8. On January 11, 2010, Appellant agreed to a stipulation withdrawing the unresolved motion to stay the Confirmation Order filed in the Second Circuit in exchange for an agreement that no party would use the withdrawal as evidence that the appeal now before this Court was equitably moot.

9. Appellant initially presented other additional questions but subsequently narrowed its request for relief. (*See* Appellant's Br. at 1; Appellant's Reply Br. at 1.) The Court notes that though Appellant claims only two issues are presented on appeal, Appellant curiously raises the three indicated above.

10. Appellant contends that this appeal is not moot because it "has bearing on a live dispute." (Appellant's Br. at 23.) The Court notes that the Bankruptcy Court likely dis-

agrees, as it believed its decision "on standing and plan confirmation ... ma[de] it unnecessary to separately rule with respect to the Adversary Proceeding." (Confirmation Decision at 11.) More importantly, however. Appellant's argument misunderstands the law governing equitable mootness. "Unlike constitutional mootness, which turns on the threshold question of whether a justiciable case or controversy exists, equitable mootness ... is concerned with whether a particular remedy can be granted without unjustly upsetting a debtor's plan of reorganization." *In re Charter Commc'ns, Inc.*, 691 F.3d 476, 481 (2d Cir.2012); *see also In re Chateaugay Corp.* (*Chateaugay II* ), 10 F.3d 944, 952 (2d Cir. 1993) ("In bankruptcy proceedings, the mootness doctrine involves equitable considerations as well as the constitutional requirement that there be a case or controversy.").

be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings; and (e) the appellant pursued with diligence all available remedies to obtain a stay of execution of the objectionable order." *In re Chateaugay Corp. (Chateaugay II )*, 10 F.3d 944, 952–53 (2d Cir.1993) (internal citations and quotations omitted).

■ Appellant bears the burden of establishing that all of the *Chateaugay* factors have been met. *See In re Delta Air Lines, Inc.*, 374 B.R. 516, 523–24 (S.D.N.Y. 2007) *aff'd sub nom., Ad Hoc Comm. of Kenton Cty. Bondholders v. Delta Air Lines, Inc.*, 309 Fed.Appx. 455 (2d Cir. 2009) (noting that after a plan has been substantially consummated "[t]he Court then looks to the five factors ... to determine whether the appellants can show that the Court should not find their appeal equitably moot"); *In re Enron Corp.*, 326 B.R. at 502 ("Because [the appellant] cannot establish all of these factors, its appeal must be dismissed as moot."). Thus, "[o]nly if all five *Chateaugay* factors are met, and if the appellant prevails on the merits of its legal claims, will relief be granted." *In re Charter Commc'ns*, 691 F.3d at 482.

## II. Analysis

■ Substantial consummation is defined pursuant to 11 U.S.C § 1102 of the Bankruptcy Code.[11] Appellees contend, and Appellant does not dispute, that the Plan has been substantially consummated. (Appellees' Br. at 9–10.) The Court agrees. Thus, Appellant must make a showing sufficient to overcome the presumption of mootness in order to succeed on appeal. The Court considers the relevant factors below.[12]

### A. Effect on Re–Emergence as a Revitalized Entity

The second *Chateaugay* factor looks to whether the requested relief will affect the re-emergence of the debtor as a revitalized corporate entity. *Chateaugay II*, 10 F.3d at 953. Appellant suggests that the non-debtor releases can be easily excised because they were not integral to the reorganization and would not effect Debtors' re-emergence from bankruptcy.[13] (Appellant's Reply Br. at 5.) This contention is incorrect.

■ A finding in Appellant's favor would require vacatur of the entire Plan. The First Lien Lenders' sole entitlement to the value of the FCC licenses held by

11. A plan is substantially consummated after: "(A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan." 11 U.S.C. § 1101(2).

12. For the reasons that follow, Appellant clearly fails to make the requisite showing on two *Chateaugay* factors. Extensive treatment of effective relief under the first factor is thus unnecessary, though the Court notes that this case is unlike others in which relief was unavailable. *Compare United States v. Salerno,* 932 F.2d 117, 123 (2d Cir.1991) (holding the

court could not afford relief because the Bankruptcy Code specifically prohibited "reversal or modification on appeal" of unstayed sales or leases of property made in good faith); *In re Motors Liquidation Co.*, 428 B.R. 43, 60–61 (S.D.N.Y.2010) (holding that "rewriting and unraveling the integrated terms" of a contract was beyond the power of the court). Appellees argue that any relief would portend serious consequences up to and including "dissolution of ION's new corporate structure." (Appellees' Br. At 12.) These arguments are considered under the second and third *Chateaugay* factors.

13. Appellant neglected to address this factor with respect to breach of the Security Agreement.

ION was a necessary bargaining chip given that ION's asset value was insufficient to secure the first lien debt. (*See* Confirmation Decision at 11–12; 27–28.) The Bankruptcy Court also correctly noted that the non-debtor releases were "nonseverable and mutually dependent." (*See* Appellant's Br., Ex. 17 at Art. XIII(I).) *Cf. In re Delta Air Lines*, 374 B.R. at 523–24 (noting that mutual releases were integral to the settlement and could not be severed in light of language stating "all provisions of this agreement are essential, non-severable terms"). The Court is not persuaded that a substantially similar provision in the Security Agreement should be read differently.[14]

Granting relief in this case would require a reversal of the entire Confirmation Order, force fruitless renegotiation of the Plan, and thrust ION back into bankruptcy.[15] Moreover, Appellees' predict severe harm to ION as a result of further bankruptcy proceedings and Appellant has failed to respond substantively to these assertions. (*See* Appellees' Br. at 15–17, Ex. 4.) The Plan confirmed by the Bankruptcy Court was "the product of an intense multi-party negotiation, and removing a critical piece … would impact other terms of the agreement and throw into doubt the viability of the entire Plan." *In re Charter Commc'ns*, 691 F.3d at 485; *cf. In re Metromedia*, 416 F.3d at 145 (finding an appeal equitably moot where the challenged provision was essential to secure a compromise embodied in the reorganization plan); *In re Enron Corp.*, 326 B.R. at

503 (same); *Trans World Airlines, Inc. v. Texaco, Inc. (In re Texaco)*, 92 B.R. 38, 45–50 (S.D.N.Y.1988) (same). The FCC licenses were necessary to secure ION's first lien debt and "to nullify the releases while leaving the remainder of the consummated [Plan] intact would ignore the tradeoff that allowed the parties to settle in the first instance and would treat a non-severable provision … as dispensable." *In re Delta Air Lines*, 374 B.R. at 523.

Accordingly, the Court finds that Appellant has failed to make a sufficient showing as to this element. *Cf. In re Metromedia*, 416 F.3d at 145 ("Even if we could carve out appropriate claims from the non-debtor releases, we would not do so. If appellants' claims are substantial (as they urge), it is as likely as not that the bargain struck by the debtor and the released parties might have been different without the releases.").

## B. Unraveling Intricate Transactions

Under the third *Chateaugay* factor, any relief must not "create an unmanageable, uncontrollable situation for the Bankruptcy Court" by unraveling intricate transactions so as to call into question the transactions already performed. *Chateaugay II*, 10 F.3d at 953. Appellees' brief contains an exhaustive list of steps already implemented under the Plan. (*See* Appellees' Br. at 9–10.) The Court notes that as of the filing of this appeal, all outstanding debt had either matured or been extinguished; $4.9 million was distributed to

---

14. A district court may not rely solely on a nonseverability clause to conclude that particular terms were crucial to the bargaining parties. *See In re Charter Commc'ns*, 691 F.3d at 485. Here, however, the Bankruptcy Court identified sufficient additional evidence that the releases were exchanged for Debtors' retention of ownership over the FCC licenses. (*See* Confirmation Decision at 27 (noting that "while awaiting [FCC] authorization [Debt-

ors] need the continued cooperation of the parties being released in order to achieve the objectives of the Plan").)

15. Appellees also contend that ION is unlikely to secure the new financing necessary to survive another Chapter 11 proceeding, diminishing the likelihood that ION would again reemerge as a productive corporation. (*See* Appellees' Br. at 15.)

the indenture trustee for allocation to the holders of second priority notes; general unsecured warrants for holders of general unsecured claims were issued; all previously issued shares of ION common and preferred stock were cancelled; new common stock was issued to holders of DIP financing claims and first lien debt claims following FCC approval of the transfer of control; a new certificate of incorporation was filed with the Secretary of State of Delaware; ION entered into a new shareholders agreement; and the company formed a new board of directors. (*Id.*)

Appellant's requested relief would "knock the props out from under the authorization" for these actions and impose upon the Bankruptcy Court the hopelessly unmanageable task of unraveling complex transactions that have already taken place. *Chateaugay II*, 10 F.3d at 953. The Court declines to condone such an onerous and inequitable result for the benefit of a single, non-consenting creditor. (*See* Confirmation Decision at 28 ("Cyrus is the only party seeking to block a fully consensual [C]hapter 11 plan for the Debtors.").)

## CONCLUSION

In light of the foregoing, the Court concludes that Appellant has failed to overcome the presumption of equitable mootness.[16] Accordingly, the Court finds that Appellant's claims regarding the breach of the Security Agreement and the propriety of the non-debtor releases were rendered equitably moot by the substantial consummation of the reorganization plan approved by the Bankruptcy Court. Appellant's ap-

peal is dismissed and the Clerk of the Court is directed to close this case.

**SO ORDERED.**

---

**16.** The final *Chateaugay* factors are procedural and require that (1) any adversely affected parties has an opportunity to be heard and (2) the appellant pursued all available remedies to stay the questioned order. *Chateaugay II*, 10 F.3d at 953. As with the first prong, the Court need not reach these issues because a sufficient showing as to all elements is necessary to overcome the presumption of mootness.